No. 97-598

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 160

DONALD M. KAEDING and

LOUISE E. KAEDING, husband and wife,

Plaintiffs and Appellants,

v.

W.R. GRACE & CO.--CONN.,

a Connecticut corporation,

Defendant and Respondent.

APPEAL FROM: District Court of the Nineteenth Judicial District,

In and for the County of Lincoln,

The Honorable Michael C. Prezeau, Judge presiding.

COUNSEL OF RECORD:

For Appellants:

Jon L. Heberling; McGarvey, Heberling, Sullivan & McGarvey,

Kalispell, Montana

Julianne Hinchey; Hinchey Law Offices, Kalispell, Montana


For Respondent:

Gary L. Graham; Garlington, Lohn & Robinson, Missoula, Montana


Submitted on Briefs: April 2, 1998

Decided: June 23, 1998

Filed:

_____

Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

**¶1 Appellants Donald M. and Louise E. Kaeding (the Kaedings) appeal from the order of the Montana Nineteenth Judicial District Court, Lincoln County, granting summary judgment in favor of Respondent W.R. Grace & Company (W.R. Grace). We affirm.**

**¶2 We restate the issues on appeal as follows:**

**¶3 1. Did the District Court err in holding that the Kaedings' claims were not filed within the statute of limitations and in granting summary judgment for W.R. Grace?**

**¶4 2. Did the District Court err in considering the September 1, 1992 letter from Dr. Alan Whitehouse (Dr. Whitehouse) to the Kaedings' attorney?**

## Factual and Procedural Background

¶5 From 1962-64, Donald Kaeding (Kaeding) worked in a vermiculite mine and mill located near Libby, Montana. Vermiculite is a silicate mineral used in insulation. W. R. Grace owned and operated the mine during Kaeding's tenure there and until its closure in 1990. The Kaedings allege that well before 1962, W.R. Grace was aware that the vermiculite dust contained asbestos and that asbestos was a serious health hazard. The Kaedings contend that W.R. Grace did not warn its employees that the dust in its facility could be harmful. W.R. Grace argues that it provided the employees with respirators to protect them from the dusty conditions.

¶6 Over the past thirty years, Kaeding has suffered lung- and heart-related ailments. He has visited many doctors and heard various medical opinions and diagnoses. In 1967, a radiologist noted Kaeding had "old fibrosis" in his lungs, which "suggests the possibility of asbestosis with fibrosis and scarring." In about 1969, Kaeding was diagnosed with thyroid toxicosis (Grave's disease) and with tuberculosis (TB) in 1971. From 1973 to 1995, several x-rays of Kaeding's lungs revealed scarring from the TB. In 1983, Kaeding was examined by Dr. Huffman in Libby, Montana and told he had "chronic lung disease secondary to pneumonia and smoking. . . ." Dr. Huffman examined Kaeding again in 1985 and diagnosed him with "emphysema from history of smoking and working at W.R. Grace."

¶7 In 1983, W.R. Grace conducted breathing tests of current and former employees of the vermiculite mine. At that time, Kaeding learned that the vermiculite dust he was exposed to while employed by W.R. Grace contained asbestos. In January 1985, W.R. Grace mailed Kaeding the results of the radiological tests it had conducted. The report noted that Kaeding's "pleural placquing [plaque on the membrane lining the lungs and chest cavity] is most compatible with asbestosis but the hilar retraction would be more typical of silicosis."

¶8 Kaeding's brother, who had also worked at W.R. Grace's facility, was diagnosed with asbestosis in 1990. In 1991, during an examination at the Veteran's Administration (VA) Hospital in Spokane, Kaeding told Dr. Howard Platter that he had worked in W.R. Grace's facility for two years and that the facility had been shut down because a number of employees had developed pulmonary troubles. Kaeding also told Dr. Platter about his brother's employment with W.R. Grace and his asbestosis. In Kaeding's radiology diagnostic report, Dr. Platter reported what

Kaeding had told him and noted that the "question in this case is whether the present findings could involve an unusual case of asbestosis."

¶9 Kaeding's medical records also contain a "progress note" dated October 22, 1991 written by a nurse at the mobile VA Hospital in Libby. This note states: "[A]ppears to be an advanced case of asbestosis." A September 15, 1992 radiology diagnostic report from the Spokane VA Hospital states: "By history, the patient is said to have an old asbestosis." Kaeding contends that Dr. Platter's notes regarding Kaeding's brother's history of asbestosis were inadvertently carried forward in subsequent records as Kaeding's own history of asbestosis.

¶10 In 1992, Kaeding retained attorney Tom Baiz (Baiz) to represent him in a possible claim against W.R. Grace. Baiz's practice included representing other individuals who had contracted asbestos-related diseases after exposure at W.R. Grace's facility in Libby. Baiz obtained Kaeding's medical records and sent them to Dr. Whitehouse, a pulmonary specialist practicing in Spokane. Dr. Whitehouse was familiar with the conditions at W.R. Grace's facility and had seen about 200 of W.R. Grace's former employees who were suffering from pulmonary conditions.

¶11 On September 1, 1992, after reviewing two of Kaeding's x-rays, Dr. Whitehouse sent Baiz a letter expressing his opinion. He stated that Kaeding had, among other things, "pleural thickening and calcification along both lateral chest walls, and involving both diaphragmatic surfaces, and those findings are all compatible with asbestosis." Dr. Whitehouse noted that he had not seen the pattern of scarring displayed by Kaeding with asbestosis patients previously. However, Dr. Whitehouse concluded:

> It would appear to me as if the basilar changes that are present in the lower lung zones are quite easily ascribable to asbestosis. In view of the fact that there is an exposure history, and although I do not know all of the details of that exposure history, that was a period of time that there was considerable asbestosis exposure at the mine. . . .
>
> Basically in conclusion then my opinion would be that the lower findings on the chest x-ray are consistent with asbestosis. . . .

¶12 On October 7, 1992, Baiz sent a letter to counsel for W.R. Grace regarding

Kaeding and three other former employees at the mine. Baiz stated he was "attempt [ing] to negotiate settlements in these cases without formally proceeding with litigation." Baiz enclosed Kaeding's biography and exposure history, his medical records, and the letter from Dr. Whitehouse.

¶13 Kaeding states that he never saw the letter from Dr. Whitehouse to Baiz and was not told of its contents. In 1992 and 1993, Kaeding was again examined by a physician at the Spokane VA Hospital and told that his lungs were "clear." Kaeding was not examined personally by Dr. Whitehouse until May 1996, when he was referred by his doctor in Libby. At that time, Dr. Whitehouse performed a physical examination, pulmonary function tests, and a chest x-ray. Dr. Whitehouse's prior opinion was confirmed, and he diagnosed Kaeding with asbestosis.

¶14 On June 12, 1996, the Kaedings filed a complaint in the District Court alleging fraud and intentional injury, negligence, failure to provide a safe workplace, and strict liability. W.R. Grace moved for summary judgment, arguing that the statute of limitations had run on the Kaedings' claims. The Kaedings filed a brief in opposition to the motion and a motion in limine to exclude evidence of the September 1, 1992 letter from Dr. Whitehouse. On August 26, 1997, the District Court granted summary judgment in favor of W.R. Grace and denied the Kaedings' motion in limine. The Kaedings appeal from this order.

Standard of Review

¶15 We review a district court's grant of summary judgment de novo, applying the same standard as the district court pursuant to Rule 56, M.R.Civ.P. Mead v. M.S.B., Inc. (1994), 264 Mont. 465, 470, 872 P.2d 782, 785. In Bruner v. Yellowstone County (1995), 272 Mont. 261, 264-65, 900 P.2d 901, 903 (citations omitted), we set forth our inquiry:

> The movant must demonstrate that no genuine issues of material fact exist. Once this has been accomplished, the burden then shifts to the non-moving party to prove, by more than mere denial and speculation, that a genuine issue does exist. Having determined that genuine issues of fact do not exist, the court must then determine whether the moving party is entitled to judgment as a matter of law. We review the legal determinations made by a district court as to whether the court erred.

Discussion

**¶16 1. Did the District Court err in holding that the Kaedings' claims were not filed within the statute of limitations and in granting summary judgment for W.R. Grace?**

**¶17 An action for personal injury must be commenced within three years from the time that the claim or cause of action accrues. Section 27-2-204, MCA. A claim or cause of action accrues "when all elements of the claim or cause exist or have occurred, the right to maintain an action on the claim or cause is complete, and a court or other agency is authorized to accept jurisdiction of the action." Section 27-2-102(1)(a), MCA. Generally, lack of knowledge by the claimant of the claim or cause of action, or its accrual, does not postpone the beginning of the period of limitations. Section 27-2-102(2), MCA. However, when the facts constituting the claim are by their nature concealed or self-concealing, the period of limitations does not commence "until the facts constituting the claim have been discovered or, in the exercise of due diligence, should have been discovered by the injured party. . . ." Section 27-2-102(3), MCA. Asbestosis is a latent disease that is, by its nature, self-concealing. Thus, the inquiry in this case is when Kaeding discovered or, in the exercise of due diligence, should have discovered that he had asbestosis.**

**¶18 This Court discussed the accrual of a cause of action for latent disease in Hando v. PPG Industries, Inc. (1989), 236 Mont. 493, 771 P.2d 956. In 1982, Hando was assigned the duty of painting inside the coal processing plant where she was employed. Hando, 771 P.2d at 958. In the years following her exposure to the paint, which was manufactured by PPG Industries, she suffered numerous physical, mental, and emotional reactions. Hando, 771 P.2d at 958. Suspecting that the reactions had been caused by her exposure to the paint, she filed a workers' compensation claim. However, none of the numerous physicians who examined Hando from 1982 to 1984 found a causal connection between her continuing ailments and her exposure to PPG paint. Hando, 771 P.2d at 958. Finally, in 1984, one doctor stated that he believed her problems may have been caused by her exposure to the PPG paint. Hando, 771 P.2d at 958.**

**¶19 In October 1985, Hando filed suit against PPG for products liability. Hando, 771 P.2d at 958. PPG filed a motion for summary judgment, arguing that Hando's claim**

was barred by the three-year statute of limitations. The district court held that the statute had been tolled until April of 1984, when a physician diagnosed the causal connection between Hando's ailments and her exposure to the PPG paint. Hando , 771 P.2d at 959. On appeal, this Court agreed. Hando, 771 P.2d at 962.

¶20 We stated:

> The facts in the present case indicate that although Hando was very much aware of those continuing physical, emotional and mental ailments she suffered after her exposure to the paint, she did not know the cause of those injuries until May of 1984. Prior to that time, she . . . suspected that her ongoing ailments stemmed from her exposure to the paint manufactured by PPG. She even filed a workers' compensation claim in May of 1982 based upon this belief. However, the veracity of her belief was not known until May of 1984. Medical tests done in Chicago at that time provided Hando with a medical diagnosis that her continuing problems were due to a "sensitivity to petrochemicals," a sensitivity most likely triggered by her exposure to the PPG paint.

Hando, 771 P.2d at 962. We noted that although Hando had diligently sought to determine the cause of her ailments, none of the physicians who examined her prior to 1984 attributed her ailments to the exposure to PPG paint. Hando, 771 P.2d at 962. We held that "the three-year statute of limitations did not begin to run until a medical opinion was rendered in April-May of 1984 linking her injuries to her exposure to the PPG paint." Hando, 771 P.2d at 962.

¶21 Kaeding argues that Hando stands for the proposition that the statute of limitations does not begin to run in a latent disease case until there is: (1) a "medical diagnosis"; (2) that links the harmful exposure to the disease. Kaeding thus argues that the statute of limitations was tolled on his claims against W.R. Grace until 1996, when he was diagnosed with asbestosis for the first time by Dr. Whitehouse.

¶22 In Hando, this Court did not hold that a medical diagnosis must be rendered before the statute of limitations may run. Although Hando had suspected all along that her exposure to the paint was causing her illness, none of the medical opinions

she received confirmed this suspicion. <u>Hando</u>, 771 P.2d at 958. It was only after a doctor finally diagnosed her as suffering from sensitivity to petrochemicals triggered by her exposure to the PPG paint that she was able to verify her suspicion of a causal connection between her exposure and subsequent illness. <u>Hando</u>, 771 P.2d at 958.

¶23 Conversely, in this case, Kaeding's medical records contain several references to asbestosis prior to the actual diagnosis rendered by Dr. Whitehouse in 1996. As early as 1967, Kaeding's x-ray suggested "the possibility of asbestosis." In 1983, W.R. Grace sent Kaeding the results of his breathing tests, which revealed "pleural placquing . . . most compatible with asbestosis." By 1992, Kaeding's medical records contained two radiology diagnostic reports mentioning asbestosis: one suggesting that he suffered from "an unusual case of asbestosis" and one which stated he had "an old asbestosis." Further, a progress note written by a nurse at the mobile VA hospital in Libby stated that Kaeding "[a]ppears to be an advanced case of asbestosis." While Kaeding may not have received a technical diagnosis of asbestosis, several doctors who examined Kaeding prior to 1994 were of the opinion that his medical problems were attributable, at least in part, to asbestosis.

¶24 Further, while Hando had no proof that exposure to paint could cause the type of symptoms she was experiencing until a doctor verified her suspicions, that is not the case here. Kaeding knew that exposure to vermiculite at W.R. Grace could cause asbestosis or other asbestos-related medical problems. When W.R. Grace conducted breathing tests of all of its past and present employees in 1983, Kaeding knew the vermiculite contained asbestos and that his exposure put him at risk for asbestos-related diseases. That same year, Kaeding's doctor considered his exposure history and diagnosed him with "emphysema from history of smoking and working at W.R. Grace." In 1990, Kaeding's brother, who had worked in the same facility, was diagnosed with asbestosis.

¶25 Even more significantly, in 1992, Kaeding hired an attorney (Baiz) whose practice included asbestos litigation to investigate a possible claim against W.R. Grace. Baiz sent Kaeding's medical records to Dr. Whitehouse, a pulmonary specialist who had seen more than 200 similar cases and was familiar with the exposure history at W.R. Grace's facility. After reviewing Kaeding's records and x-rays, Dr. Whitehouse concluded that the findings were consistent with asbestosis. Regardless of whether this constituted a "medical diagnosis" of asbestosis, Dr. Whitehouse's findings were certainly sufficient to give Baiz notice that Kaeding likely

suffered from asbestosis. Kaeding contends that he never saw the letter from Dr. Whitehouse and was unaware of its contents. However, the District Court held that knowledge of the information contained in Dr. Whitehouse's letter to Baiz is imputed to Kaeding, and we agree.

¶26 The attorney-client relationship is an agency relationship. Smith v. Fladstol (1991), 248 Mont. 18, 807 P.2d 1361. Under Montana law, a principal is deemed to have notice of all information known by his or her agent that the agent should, in good faith and exercising due care and diligence, have communicated to the principal. Section 28-10-604, MCA; Williams v. State Medical Oxygen & Supply, Inc. (1994), 265 Mont. 111, 874 P.2d 1225. Thus, knowledge of facts by an attorney is knowledge by the client, regardless of whether the attorney actually communicated the information to the client. See Central Bank & Trust Co. v. Lee C. Nelson, Inc. (D. Mont. 1963), 221 F. Supp. 721; Unland v. City of Lincoln (Neb. 1995), 530 N.W.2d 624. Kaeding argues that knowledge of Dr. Whitehouse's letter cannot be imputed to him because the statute of limitations inquiry in latent injury cases is whether the claimant had actual knowledge of the elements of the claim. We disagree. Under § 27-2-102(3), MCA, the proper inquiry is when the claimant discovered *or, in the exercise of due diligence, should have discovered* the elements of the claim or cause of action. The District Court correctly imputed knowledge of the medical opinions contained in Dr. Whitehouse's letter to Kaeding.

¶27 We hold that with the numerous references to asbestosis in his medical records, Kaeding's knowledge of his risk for asbestos-related diseases from exposure at W.R. Grace, and the conclusions Dr. Whitehouse rendered in 1992, Kaeding should have discovered that he suffered from asbestosis by September or October of 1992, at the latest. By that date, Baiz had learned that Dr. Whitehouse found Kaeding's x-rays consistent with asbestosis and had used this information as leverage in a settlement offer to W.R. Grace. Kaeding's waiting several years to follow up with Dr. Whitehouse or to inquire further about his possible claim does not demonstrate due diligence. Kaeding did not file his complaint in the District Court until June 12, 1996. Accordingly, we hold that his claim is barred by the three-year statute of limitations.

¶28 Based on the foregoing, we affirm the District Court's grant of summary judgment for W.R. Grace.

¶29 2. Did the District Court err in considering the September 1, 1992 letter from Dr.

**Whitehouse to the Kaedings' attorney?**

**¶30 Kaeding also argues that the District Court erred in denying his motion in limine to exclude the September 1, 1992 letter from Dr. Whitehouse to Baiz. First, Kaeding argues that the letter is inadmissible because it was offered in the context of settlement negotiations. Rule 408, M.R.Evid., states:**

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

The letter from Dr. Whitehouse is not a statement made in a compromise negotiation. Under the plain language of Rule 408, M.R.Evid., evidence that is otherwise discoverable is not rendered inadmissible simply because it is presented in the course of compromise negotiations. Further, Rule 408, M.R.Evid., only excludes evidence that is being offered to prove liability or the validity of a claim or amount. In this case, Dr. Whitehouse's letter was offered to show knowledge; that is, that Kaeding knew or should have known the facts constituting his claim against W.R. Grace.

**¶31 Kaeding argues further that Dr. Whitehouse's letter is not relevant to show what he knew because he never saw the letter and was not informed of its contents. However, as discussed in issue 1, <u>supra</u>, the contents of the letter were known by Kaeding's attorney, and this information is imputed to Kaeding. Thus, Dr. Whitehouse's letter is relevant to show when Kaeding knew or, with due diligence, should have known that his cause of action had accrued. Therefore, we hold that the District Court did not err in denying Kaeding's motion in limine and in considering Dr. Whitehouse's letter for purposes of summary judgment.**

**¶32 Based on the foregoing, we affirm the decision of the District Court.**

/S/ W. WILLIAM LEAPHART

We concur:

/S/ J. A. TURNAGE

/S/ KARLA M. GRAY

/S/ JAMES C. NELSON

Justice Terry N. Trieweiler dissenting.

**¶33 I dissent from the majority's conclusion that the District Court correctly granted summary judgment to the defendant in this case.**

**¶34 While the majority's recitation of the facts might suffice as a closing argument to the jury on behalf of the defendant, in terms of this Court's responsibility, which is to construe the record most favorably to the party opposing summary judgment, it is completely inadequate.**

**¶35 Although I would concede that there are facts from which persuasive jury argument can be made by the defendant, let me, consistent with the proper nature of our review, point out those facts which are most favorable to the party who opposed summary judgment.**

**¶36 The issue in this case is simply whether it can be concluded as a matter of law when Kaeding knew or should have known that he had asbestosis which was causally related to his employment at W.R. Grace & Co., or whether the date on which he would have, with due diligence, discovered his condition, is a question of fact. Only two witnesses testified in this case--the plaintiff, Donald Kaeding, and Alan Whitehouse, M.D., the physician who ultimately diagnosed Kaeding's condition.**

**¶37 Kaeding had been diagnosed with heart failure as far back as 1968, and was disabled since 1970 from a combination of heart problems, thyroid toxicity, and other conditions. Because of his health problems, he frequently saw doctors in his home town of Libby, and at the Veterans' Administration Hospital in Spokane, Washington.**

¶38 He testified that he was told by W.R. Grace officials that the reason for their evaluation of him in 1983 was that there was asbestos in the dust where he had been employed, but that they did not explain to him that the asbestos was harmful. He knew of no co-workers who had respiratory problems while he worked at W.R. Grace. He first developed symptoms of shortness of breath in 1994. When he went to the VA hospital with complaints of difficulty breathing, he was advised that it was probably due to his heart.

¶39 Kaeding testified directly that he first became aware that he had asbestosis in 1996 following his examination by Dr. Whitehouse. Prior to then, he had no idea that he had asbestosis, nor that he had any lung condition consistent with asbestosis.

¶40 Kaeding did become aware of an abnormal chest x-ray in 1971, but was told that it was related to scarring from a former condition of tuberculosis. His medical records, over a period of nearly thirty years, show repeated references to abnormal chest film due to a former condition of tuberculosis.

¶41 Kaeding testified that in 1985 he did receive a letter from W.R. Grace explaining that his 1983 chest film showed signs of asbestos tracking. However, he was advised to consult with his family doctor. When he did so, he was told that there was nothing to worry about. Instead, his family physician attributed his respiratory condition to smoking and pneumonia.

¶42 Kaeding testified that prior to his 1996 examination by Dr. Whitehouse, he has no recollection of being advised by any physician or other health care provider that he had abnormal radiology studies as a result of possible asbestosis. The radiology studies of his chest were only discussed with him as they related to signs of former tuberculosis.

¶43 Kaeding testified that he did retain an attorney in 1990 or 1991 to investigate a possible claim against W.R. Grace for dust-related health problems. However, he did not specifically relate his problems to asbestos and was not advised differently following Dr. Whitehouse's evaluation of his radiology studies.

¶44 Dr. Whitehouse has been a pulmonologist for thirty years and has examined about 200 people from Libby with asbestosis. He examined radiologic studies of Kaeding's lungs in 1992 at the request of Kaeding's attorney, and felt that they were

consistent with asbestosis, but also had questions about prior tuberculosis and arrived at no diagnosis at that time. He explained that he could not make a diagnosis of asbestosis without a clinical examination and that he did not see Kaeding personally until May 2, 1996.

¶45 Dr. Whitehouse testified that when he did evaluate Kaeding in 1996 he found pleural placquing and interstitial disease which is a partial basis for his diagnosis of asbestosis, but explained that similar findings can result from a variety of diseases, including tuberculosis or empyema. Empyema is an infection in the chest which can result from either tuberculosis or bacteria, and is a significant illness. It is possibly for this reason that after reviewing Kaeding's medical records he observed that no two health care providers had ever interpreted the chest films the same way, and that the condition that Dr. Whitehouse ultimately diagnosed was frequently referred to as something that it was not. He noted that some of the radiology reports in Kaeding's medical records refer to the condition which he ultimately diagnosed as asbestosis as granulomatous disease, tuberculosis, or old empyema. He testified that some of the radiological abnormalities could have resulted from the thyroid toxicosis for which Kaeding had been treated.

¶46 However, in spite of the various explanations found in Kaeding's medical records for abnormal x-ray film findings, there are also periodic reports in his VA records that his heart and lung examination was normal. These reports appear in 1988, 1992, and 1993.

¶47 In none of Kaeding's medical records did Dr. Whitehouse find any indication that Kaeding himself related a history of asbestosis.

¶48 The majority thinks it is significant that Dr. Whitehouse reported radiological findings consistent with asbestosis to Kaeding's attorney in 1992, and concludes that at least that information should have caused a reasonable person to inquire further about his health. However, even if it is assumed that that information was communicated to Kaeding (and he testified that it was not), he did have subsequent examinations, none of which confirmed cause for concern until his 1996 exam by Dr. Whitehouse. For example, on September 15, 1992, two weeks after Dr. Whitehouse's letter, reports of radiology studies done at the VA hospital indicate that lung findings are suggestive of old tuberculosis and that there is no evidence of active pulmonary disease or cardiac failure. A February 9, 1993, discharge summary from the same

hospital indicated that Kaeding's lungs were clear; and an April 1, 1993, report from the same hospital indicated that Kaeding had old tuberculosis and bilateral empyema, but made no mention of asbestosis. Finally, on January 19, 1995, a radiology report from the VA hospital described Kaeding's condition as "old inactive fibroid type of tuberculosis."

¶49 Dr. Whitehouse testified that the vast majority of Kaeding's x-ray film interpretations from 1973 to 1995 were incorrect. He further testified that in his experience, patients virtually never see their medical records. The only time his patient records have been requested is when someone sues him. He estimated that one-half of one percent of patients ever review their own medical records, regardless of who their health care provider is, and he saw no indication from any of Kaeding's records that he had ever been informed that he had asbestosis before 1996; nor did he see any indication from the records that a proper diagnosis of asbestosis had ever been made before 1996. He explained that it is not unusual for health care providers who do not specialize in lung disease to miss a diagnosis of asbestosis, and explained that even radiologists miss the signs for the condition more than half the time. He also explained that his 1992 observation of signs consistent with asbestosis is entirely different than a diagnosis of asbestosis.

¶50 In light of Kaeding's prolonged and complicated health history, the frequently incorrect information with which he was provided, and the contradictory findings that pervaded his medical records, it is impossible to conclude, as the majority does, that as a matter of law Kaeding knew or should have known before 1996 that he had asbestosis.

¶51 The majority suggests that this case is distinguishable from *Hando v. PPG Industries, Inc.* (1989), 236 Mont. 493, 771 P.2d 956, because in that case the plaintiff had not received medical information confirming her condition or its relation to her employment prior to 1984. To make that distinction, the majority has to assume that Kaeding's condition was communicated to him prior to 1996. However, that assumption is contrary to both Kaeding's direct testimony and Dr. Whitehouse's conclusion from his review of Kaeding's records. It was not the function of the District Court, and it is not the function of this Court to make those assumptions in deciding a motion for summary judgment. If anything, our decision in *Hando* and the uncontroverted testimony in this case would support summary judgment for Kaeding.

¶52 The majority opinion makes reference to entries in Kaeding's medical records which suggest "the possibility of asbestosis," signs "compatible with asbestosis," and problems attributable "at least in part to asbestosis." However, what the majority fails to point out is that subsequent to each of these entries, Kaeding was again examined with contradictory findings, such as "scarring from old TB," "emphysema from history of smoking and working at W.R. Grace," "old empyema," and respiratory problems "secondary to smoking and pneumonia." What difference does it make if medical records include reference to asbestosis (even assuming it had been communicated to him in spite of his direct testimony that it had not) when follow-up exams suggested something to the contrary?

¶53 The majority also observes that while Kaeding received no technical diagnosis of asbestosis, several doctors were of the opinion prior to 1994 that his problems were attributable, in part, to asbestosis. Apparently, the majority feels more qualified to draw those conclusions from a review of Kaeding's medical records than was Dr. Whitehouse, who is the only physician to testify in this case and who testified that Kaeding's medical records include no diagnosis of asbestosis prior to his, which was made in 1996.

¶54 Finally, the majority concludes that it is significant that in 1992 Dr. Whitehouse reported x-ray findings consistent with asbestosis. However, as pointed out, the majority totally ignores the fact that on at least four occasions subsequent to that report, Kaeding was examined again by health care providers who concluded that his chest exams were normal or that any abnormalities were attributable to conditions other than asbestosis.

¶55 The question in this case is when Kaeding knew, or by the exercise of reasonable diligence should have known, that he had a disabling condition known as asbestosis caused by his employment with W.R. Grace & Co. Based on Kaeding's direct testimony, and the only medical testimony offered in this case, he did not know that fact until 1996. Furthermore, based on any reasonable inference from the inconsistent and contradictory findings in his medical records, it was reasonable for him to believe prior to 1996 that any symptoms he was experiencing or any abnormal finding from his x-ray films were attributable to something other than asbestosis. At best, there was contradictory evidence which it is the function of a jury, not this Court or the District Court, to resolve.

¶56 Summary judgment on a factual issue is an extreme remedy which should be reserved for those situations where the facts are not in dispute. No fair review of the record in this case could lead to that conclusion.

¶57 For these reasons I dissent from the majority opinion. I would reverse the judgment of the District Court and remand to the District Court for a trial to determine whether Donald Kaeding's claim against W.R. Grace & Co. was barred by the statute of limitations.

/S/ TERRY N. TRIEWEILER

Justice William E. Hunt, Sr., joins in the foregoing dissenting opinion.

/S/ WILLIAM E. HUNT, SR.