No. 92-241

IN THE SUPREME COURT OF THE STATE OF MONTANA

1993

IN RE THE MARRIAGE OF

JOANN JOCELYN NIKOLAISEN,

      Petitioner and Appellant,

  and

ALAN KRIS NIKOLAISEN,

      Respondent and Respondent.

APPEAL FROM:   District Court of the Fifteenth Judicial District,
In and for the County of Sheridan,
The Honorable M. James Sorte, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

          Richard J. Carstensen, Attorney at Law,
Billings, Montana

      For Respondent:

          Laura Christoffersen, Gallagher, Archambeault,
& Knierim, Wolf Point, Montana

FILED

Filed:   FEB 1 1 1993

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

Clerk

Submitted on Briefs: November 5, 1992

Decided: February 11, 1993

Justice William E. Hunt, Sr., delivered the opinion of the Court.

Appellant JoAnn Jocelyn Nikolaisen appeals from a judgment of the Fifteenth Judicial District Court, Sheridan County, modifying the divorce decree regarding child support and custody.

We affirm in part and reverse and remand.

JoAnn (Joey) presents to this Court three issues for our consideration which we reduce and rephrase as follows:

1. Did the District Court abuse its discretion in modifying child custody and visitation of the minor children?

2. Did the District Court err in allowing respondent to incorporate the provisions of his Chapter 12 bankruptcy plan as well as other "legitimate business expenses" when it calculated child support?

3. Did the District Court err in failing to order respondent to pay Joey's educational loans?

Alan and Joey Nikolaisen were married on August 4, 1972, in Plentywood. Two children were born into the marriage. The parties primarily resided in Plentywood until the original dissolution decree was entered on June 8, 1987. Currently, Alan lives on his farm near Plentywood and is an accountant and farmer/rancher. Joey is a counselor and lives in Billings. Both parties have had physical custody of the children over an extended period of time. From 1985 to the entry of the decree, Alan had physical custody of the children. Since 1987 to the present, Joey has had primary physical custody of the children pursuant to a joint custody

2

agreement signed by both parties. The original decree and custody agreement does not provide for custody after 1988.

Both children have ailments which require medical attention. The oldest child, Jessica, was 14 years old at the time of trial. She suffers from a round back deformity known as kyphosis. If the condition is left untreated it will result in back deformity and poor posture, and in some cases back pain is also experienced. Joshua was 11 years old at the time of trial. He was five feet tall and weighed approximately 170 lbs. He has been diagnosed as having a severe weight problem and may also have slightly high blood pressure resulting from his excessive weight. Currently, both children reside with Joey in Billings.

Both parents have had difficulty getting their children to respond to medical treatment. Joey has not been able to get Jessica to wear a back brace which would correct the curvature in her spine, and has taken the position that she will not force her to wear the brace.

Alan's efforts have been more successful. While Jessica is in his care he has been able to get her to wear the brace. Alan has had difficulty getting cooperation from Joey regarding medical appointments to determine the future course of Jessica's condition. On one occasion, Alan made an appointment with Jessica's orthopedic doctor in Billings for spinal x-rays. Upon his arrival from Plentywood, Alan found out that Joey had canceled the appointment and had taken the children to Flathead Lake.

Both parents also differ on how to best deal with Joshua's weight problem. While in his father's care in the summer months, Joshua, with Alan in attendance, participates in a weight program with good results. During the summer of 1989, Joshua lost 20 pounds, and in the summer of 1990 lost approximately 15 pounds. When Joshua returned to Joey's care, the program was discontinued. At the beginning of 1990, Joshua was approximately 37 pounds heavier than the summer before. Every summer that he has returned to Plentywood, Joshua has regained the weight that had been lost, plus he has put on some additional weight. During a medical visit, Alan discovered that Joshua may have high blood pressure due to his excessive weight. Alan asked Joey to have Joshua's blood pressure rechecked in Billings, which Joey either failed to do or failed to advise Alan that she did. Joey believes that exercise is the best method of weight loss and purchased a membership at the YMCA which Joshua has not used.

Alan's visitation rights which were originally agreed upon in the custody agreement have gradually eroded with time and have been frustrated by Joey. Alan has primary custody of the children during part of the summer and on school holidays. Over the past year, Jessica has increasingly refused to visit with her father. Joey has stated that she would not force Jessica to visit with Alan. On July 2, 1991, the District Court ordered Jessica to spend two weeks with Alan in Plentywood over the Labor Day weekend.

4

On one occasion, Joey enticed Joshua to cut short his visitation by offering to buy him tickets to a concert in Billings.

Communication between the parents with regard to the welfare of the children has broken down. Joey has failed to notify Alan of the children's activities, even though he has attended such events when advised of the time and date. In addition, Joey has continually failed to advise Alan of the children's educational progress and medical conditions.

Both parties have filed a motion for modification of custody and support. Joey claims that the children want to live with her and are now well accustomed to Billings. Alan counters that Joey is failing to meet the medical and physical needs of the children, does not encourage visitation, and in fact, impedes visitation. The children were appointed a Guardian ad Litem for the litigation. The District Court proceedings were stayed pending the outcome of Alan's Chapter 12 bankruptcy action and the filing of a plan. A hearing was held on November 19, 1991, to determine custody and child support. Both the Guardian ad Litem and the family's psychologist recommended that the children continue to reside with Joey. Both children expressed their desire to live with Joey. On March 6, 1992, the District Court issued its Findings of Fact and Conclusions of Law and Order. Joey appeals the decision of the District Court.

Did the District Court abuse its discretion in modifying child custody and visitation of the minor children?

Joey declares that it was error for the District Court to adopt verbatim Alan's proposed findings of fact and conclusions of law. We discourage district courts from adopting verbatim findings of fact and conclusions of law submitted by the prevailing party. In re Marriage of Hurley (1986), 222 Mont. 287, 295-96, 721 P.2d 1279, 1285. Although a district court may adopt verbatim findings of fact and conclusions of law, the practice does not constitute error per se. When reviewing the adequacy of the findings of fact and conclusions of law, we examine whether they are sufficiently comprehensive and pertinent to provide a basis for a decision, and whether they are supported by substantial evidence. Hurley, 721 P.2d at 1285. With the exception of child support calculations, we hold that the District Court's findings of fact and conclusions of law meet the above test.

Joey argues that the court's custody and visitation order should be stricken because it is based upon facts that were not before the court and the issues should be resolved by the court as necessary following the development of any facts that might occur later.

Recently we have stated the following principles when reviewing a district court's order modifying physical custody of a child:

Joint custody is presumed to be in the best interest of the child, § 40-4-224(1), MCA, and is awarded to assure frequent and continual contact of the minor child with both parents. Physical custody should be arranged as equally as practical between the parents to comply with the express purpose of an award of joint custody, with the child's best interest as the primary consideration. Section 40-4-224(2), MCA.

Modification of physical custody within a joint custody arrangement is proper when the change is in the best interest of the child. A request to change the physical custodian of the child requires an application of § 40-4-224(2), MCA, which states in part:

"[J]oint custody" means an order awarding custody of the minor child to both parents and providing that the physical custody and residency of the child shall be allotted between the parents in such a way as to assure the child frequent and continuing contact with both parents. The allotment of time between the parents must be as equal as possible; however,

(a) each case shall be determined according to its own practicalities, with the best interest of the child as the primary consideration . . . .

The District Court must consider the factors set forth in § 40-4-212, MCA, when determining whether the modification of physical custody is in the child's best interest. The court is under no obligation to consider the more stringent factors set forth in § 40-4-219, MCA, when faced with an action for modification of physical custody rather than an action for termination of joint custody.

In re Marriage of Ulland (1992), 251 Mont. 160, 166-67, 823 P.2d 864, 868-69.

In its order, the District Court ordered Joey to take whatever action she believes is necessary to reduce Joshua's weight. Joshua's placement was on a temporary basis contingent upon his demonstrating a substantial decrease in his weight by the summer

7

vacation in 1992. If Joey cannot get Joshua to lose the weight, then Alan may petition the court for a change of custody.

In his medical report, Dr. Peter Teal, an orthopedist, concluded that Jessica would derive very little benefit from wearing a back brace because its effectiveness diminishes once a female child reaches full growth at age 15 or 16. In its findings, the District Court ordered the parents to make an appointment with another doctor specializing in kyphosis and obtain a second opinion. If the opinion is that Jessica needs to wear a brace, then Joey would be given one month to demonstrate that she can get Jessica to wear the brace. If Joey cannot obtain Jessica's compliance, physical custody of Jessica shall be transferred to Alan. No second medical opinion was submitted into evidence for this appeal.

The court was confronted with balancing the children's wishes against what would be in their best interests, as well as ensuring that the children have a continuing relationship with their father. The court found that the children had familial and educational ties in both Billings and Plentywood. The record demonstrates that the court considered at length the children's health and welfare. The court recognized that the children did not wish to move from Billings to Plentywood. The court tailored its order so that the children could remain in Billings so long as Joey is properly attending to the children's medical problems. Both of the children's medical conditions are treatable, and the order offers

8

an incentive to Joey to ensure the children receive proper treatment.

With regard to the visitation, the court ordered a more detailed arrangement than the existing custody agreement. Again the court balanced the wishes of the children, specifically Jessica, against Alan's right to see his children and foster a meaningful relationship with them. The record demonstrates that Joey, on several occasions, has actively undermined Alan's right to see the children. Although she stated at trial that she encourages the children to visit their father, the pattern of her actions have, in reality, discouraged the children from visiting him. The court ordered that the parties should restrict the children's nonschool activities if the refuse to visit the noncustodial parent and ordered Alan and Joey to attend counseling sessions. This portion of the order is an attempt by the court to reduce the friction between the parties and have both parents actively encourage the children to have a relationship with the other parent. In addition, the District Court ordered Alan and Jessica to attend counseling sessions in an effort to facilitate more communication between the two so that Jessica will want to spend more time with her father. We hold that the District Court did not abuse its discretion in modifying custody and visitation.

II.

Did the District Court err in allowing respondent to incorporate the provisions of his Chapter 12 bankruptcy plan as

9

well as other "legitimate business expenses" when it calculated child support?

In its child support calculation, the District Court found that Alan had $102,000 in gross income while Joey had approximately $25,000 in gross income. The District Court deducted from Alan's gross income expenditures for replacement cows, office equipment, and a stock waterer. The court also deducted approximately $38,465 as a result of payments being made under Alan's Chapter 12 bankruptcy, as well as an additional $38,203 in various farm expenses. The court deducted the necessary tax payments from Alan's net income after business deductions. The court found that Alan's net income available for child support amounted to approximately $10,500, while finding that Joey had net income of $25,000 available for child support. The court did not deduct taxes from Joey's gross income, even though there was evidence offered regarding her tax liability. The court ordered Alan to pay $300 a month in child support for the entire year while Joey was responsible for approximately $600 a month. The court ordered Joey to pay three months of child support to Alan when the children are required to reside with Alan during the summer which could be deducted from Alan's overall obligation.

Joey argues that the District Court improperly used several business deductions from Alan's farm/ranch operation to reduce Alan's child support obligation. Specifically, she maintains that the court should not have applied Alan's Chapter 12 bankruptcy plan

10

payments to determine the amount of his child support obligation because it includes payments of his home mortgage. In essence, Joey is arguing that with the exception of excluding state, federal, and social security taxes, none of the deductions awarded to Alan are proper under the guidelines.

Our standard of review of the district court's findings relating to child support is that a presumption exists in favor of the district court and we will overturn the court's findings only if it has abused its discretion. In re Marriage of Sacry (Mont. 1992), 833 P.2d 1035, 49 St. Rep. 452.

Rule 5 of the Guidelines for determining Child Support implements a policy of keeping the primary focus on the needs of the children by requiring from each obligor's income only a minimum of exclusions to be allowed. Rule 5, Guidelines for Determining Child Support (1991). The following deductions subtracted from gross income are the only ones allowed under the Guidelines for the determination of net income:

> [F]ederal and state income taxes; FICA; union dues, retirement contributions, uniforms, etc., which are required as a condition of employment and are not reimbursed by the employer; legitimate business expenses; and health insurance if the benefits are maintained for the obligor parent's dependents, including the child(ren) of the action at hand. [Emphasis added.]

Rule 5, Guidelines.

The Social & Rehabilitative Services Department is responsible for the adoption of child support guidelines. Section 40-4-209(5), MCA. They have defined "net income" as meaning:

11

> [G]ross income, including imputed income and income attributed to assets, less any deductions for state or federal taxes, social security, and other similar deductions required by law or <u>court order</u>. Unreimbursed expenses incurred as a condition of employment such as union dues, retirement contributions, uniforms and other occupational or <u>business expenses</u> should also be deducted. [Emphasis added.]

46.30.1516, ARM.

We have stated that when determining income under the Guidelines, the court should examine the disposable income of the parent and not rely solely on the parent's tax returns. In re Marriage of Gray (1990), 242 Mont. 69, 73, 788 P.2d 909, 912. The extent of Alan's farm/ranch business is complex. Alan testified at considerable length regarding the income that he receives from his farm/ranch operation and his accounting position. The evidence shows that Alan's expenses were both business and personal in nature.

The court considered, and the record demonstrates, that Alan's tax returns did not provide an accurate picture of his ability to pay child support for the last two years. Alan was not in bankruptcy during the years his tax returns were filed. In one year, he had taken as income two years' worth of calf crops, and in another year he received ASCS disaster payments which would not be payable in a normal crop year. Moreover, during those tax years, he testified he had trouble getting the ASCS deficiency payments. Due to the lack of those payments, as well as a general decline in the farm economy, he became delinquent in his debt obligations and

thus the returns did not accurately reflect his debt service requirements. Furthermore, Alan testified that he had added in 75 percent of the total farm estate taxes paid as a personal expense since his personnel residence was on the farm property. He added in between one-third to three-quarters of his vehicle's value, and telephone and travel expenses because they were considered personal in nature. The Bankruptcy Court ordered Alan to pay $39,465 to the bankruptcy trustee for each year.

The deduction of the bankruptcy payments is in error. The court allowed the husband to deduct his mortgage payments on the farm before arriving at what was available for support. These mortgage payments were part of the bills that were ordered paid by the bankruptcy court. However, the principal which is applied to the mortgage each year actually increases the husband's net equity. This is especially true when the husband's income of $45,000 per year as an accountant appears to be used to subsidize his farming operations. Such payments should not be allowed to be subtracted as deductions under the guidelines. Interest on the mortgage, however, would be a legitimate business expense. There also appears to be farm equipment purchased that should have been capitalized and not deducted in full. The District Court has not followed the guidelines for determining child support. We reverse and remand for a full reconsideration and recalculation of all factors relating to child support.

## III.

Did the District Court err in failing to order respondent to pay Joey's educational loans?

Joey asserts that the Dissolution Decree provided that Alan agreed to pay Joey's educational loans and that this Court should order him to pay the loans. The record demonstrates that no evidence regarding the educational loans was presented at trial. We decline to review the matter on appeal.

We affirm in part and reverse and remand for a full reconsideration and recalculation of all factors relating to child support.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____

_____

_____
Justices

14