No. 01-094

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 9N

RALPH ANDERSON and CAPITAL FORD SALES, INC.,

        Plaintiffs and Respondents,

    v.

DUGAN ANDERSON, TERRY LEA LANE, CAPITAL
IMPORTS, INC., and WILD WEST MOTORS, INC.,
d/b/a BIG MOUNTAIN TOYOTA,

        Defendants and Appellants.
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
DUGAN ANDERSON, TERRY LEA LANE, CAPITAL
IMPORTS, INC., and WILD WEST MOTORS, INC.,
d/b/a BIG MOUNTAIN TOYOTA,

        Counterclaimants,

    v.

RALPH ANDERSON and CAPITAL FORD SALES, INC.,

        Counterdefendants.

APPEAL FROM:    District Court of the First Judicial District,
                  In and for the County of Lewis and Clark,
                  Honorable James E. Purcell and Honorable Ed McLean, Presiding

COUNSEL OF RECORD:

        For Appellants:

                Douglas J. Wold and Leslie Ann Budewitz, Wold Law Firm, PC.,
                Polson, Montana

        For Respondents:

                Ross W. Cannon, Cannon & Sheehy, Helena, Montana

                             Submitted on Briefs:  August 23, 2001
                                    Decided:  January 23, 2003

Filed:

_____
                               Clerk
Justice Jim Rice delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c) Montana Supreme Court 1996 Internal Operating Rules, the following decision shall not be cited as precedent but shall be filed as a public document with the Clerk of the Supreme Court and shall be reported by case title, Supreme Court cause number and result to the State Reporter Publishing Company and to West Group in the quarterly table of noncitable cases issued by this Court.

¶2 Ralph Anderson and Capital Ford Sales, Inc. (collectively "Ralph"), sued to collect on loans extended to his son Dugan Anderson, daughter-in-law Terry Lea Lane and his son's business enterprises (collectively "Dugan"). On summary judgment, the First Judicial District Court, Lewis and Clark County, ordered Dugan to pay loan balances with interest and Ralph's court costs and attorney fees. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 Ralph Anderson purchased the Ford dealership in Helena, Montana, from his father and for nearly 40 years owned and managed Capital Ford Sales, Inc. ("Capital Ford"). Dugan Anderson worked with his father from 1977 until 1982 when he acquired Wild West Motors, Inc. ("Wild West Motors"), which conducted business as Big Mountain Toyota in Kalispell, Montana. To obtain financing for the purchase of the Kalispell dealership, Dugan's father, mother and grandmother co-signed Dugan's bank loans. In 1984, Dugan and Ralph jointly purchased the Nissan and Mazda dealerships in Helena, renamed as Capital Imports, Inc. ("Capital Imports"), and held 51

2

percent and 49 percent interests, respectively. Again, Ralph co-signed the loans from Norwest Bank of Helena for the purchase of the dealership.

¶4 By 1987, financial difficulties at Wild West Motors required Dugan to seek Ralph's support in refinancing the dealership's loans, which then were held by Norwest Bank of Kalispell. Capital Imports and Capital Ford were also in financial distress at this time. Dugan, Ralph and other family shareholders in the three dealerships entered into a Settlement, Forbearance and Liquidation Agreement with Norwest Bank on December 8, 1987, which allowed time for the parties to obtain new financing. By the end of the month, Ralph arranged for a loan of $1,327,000 to Capital Ford from Ford Motor Credit Corporation ("Ford Credit"), a portion of which was disbursed to Dugan and his business enterprises in three separate loans totaling $506,574.42. In his capacity as the president of Wild West Motors and Capital Imports, Dugan signed promissory notes to Capital Ford for two business loans in the amounts of $141,861.14 and $288,812.30. Ralph also claims that he loaned $75,900.98 from the Capital Ford account to Dugan personally. Dugan, and his wife, Terry Lea Lane, executed personal guarantees for each note, although no promissory note or guaranty evidenced the personal loan.

¶5 After the acquisition of Capital Imports by Ralph and Dugan in 1984, Dugan frequently traveled between the Kalispell Toyota and Helena Nissan/Mazda dealerships. Dugan also worked on a consulting basis with Capital Ford, which was managed at that time by his

brother, David Anderson.  In April 1989, Capital Ford purchased the assets of Capital Imports and merged inventory and sales at one location.  Dugan continued to divide his time between Helena and Kalispell until early 1991 when he relocated to Helena to assume full-time management of the combined Nissan/Mazda and Ford dealerships.

¶6  In January 1994, Ralph and Dugan signed a Memorandum of Understanding (MOU) that outlined the process by which Dugan could purchase the Helena dealerships and take full control of all operations. In his deposition testimony, Dugan characterized his working relationship with Ralph as "difficult."  In March 1995, Dugan left Helena and resumed full-time management of Big Mountain Toyota in Kalispell.  Ralph stepped in to manage Capital Ford on a full-time basis and began negotiations to sell the dealership to a third party.

¶7   The action subject to this appeal was initiated on December 22, 1995, when Ralph filed a Complaint alleging that Dugan defaulted on three 1987 loans from Capital Ford and failed to transfer to Ralph a promised share of Wild West Motor stock.  Ralph sought payment of the loan balances with interest from the dates of default, plus attorney fees and court costs, as provided in the loan agreements.  After numerous district court judges recused themselves, the court appointed Honorable James E. Purcell to preside over the matter.

¶8  An  Amended Complaint, filed on April 16, 1996, enumerated four Counts, which we summarize as follows:

4

Count I: $141,861.14 loan to Wild West Motors, Inc., dated December 23, 1987, used to pay debts at Norwest Bank of Kalispell and to provide the dealership with working capital. Loan in default as of June 1, 1995, with an unpaid balance of $60,614.21 plus interest.

Count II: $288,812.30 loan to Capital Imports, Inc., dated December 23, 1987, used to pay the debts at Norwest Bank of Helena and to provide the dealership with working capital. Loan in default as of February 28, 1989, with an unpaid balance of $181,963.00 plus interest.

Count III: Demand for the transfer of 39 percent of Wild West Motors stock from Dugan to Ralph in exchange for financial support extended by Ralph and Capital Ford in accordance with an oral agreement.

Count IV: $75,900.98 loan to Dugan, personally, on December 23, 1987, used to pay Norwest Bank of Kalispell the balance due on the Wild West Motors stock purchase and to reduce the mortgage on Dugan's home. No payments ever received, with full amount due plus interest.

¶9 Dugan admitted in his Amended Answer that he had not paid the loan obligations in full, but raised various defenses and counterclaims. Admitting an unpaid balance of $57,863.62 on the Count I loan to Wild West Motors, Dugan argued that this debt was forgiven by Ralph as consideration for Dugan's release of all claims against Ralph for the sale of the combined Capital Ford/Capital Imports dealership to a third party in February 1997 without regard for the 1994 MOU for Dugan's purchase of the business. Regarding the Count II loan to Capital Imports, Dugan asserted that any outstanding obligation had been assumed by Capital Ford when the two entities merged in 1989. Dugan denied he promised to transfer any Wild West Motor stock to Ralph, as claimed by Count III. Dugan answered that the Count IV loan was used to

5

purchase Capital Imports stock rather than Wild West Motors stock. He asserted that Capital Ford assumed liability for the outstanding balance of that portion of the Count IV loan that went to the stock purchase when Capital Ford bought the assets and assumed the liabilities of Capital Imports. Dugan counterclaimed for loss of business opportunities, constructive discharge and other damages resulting from Ralph's alleged breach of the 1994 MOU.

¶10 Ralph was deposed by opposing counsel in April 1997. The parties entered settlement negotiations and filed one stipulation with the District Court on May 27, 1997. The stipulation stated that the pretrial order would include the affirmative defenses of statute of limitations and laches against Ralph's Count III claim. In July 1997, Ralph's attorneys advised the court by letter that the parties had agreed to eliminate three counts from the Amended Complaint. Later that month, Dugan's attorneys affirmed in another letter to the judge that only one count and the counterclaims remained for trial. In August 1997, Ralph dismissed his attorneys and the court vacated the trial date to allow Ralph time to obtain new counsel. With new counsel representing Ralph, the parties proceeded with discovery and Dugan's deposition was taken in July 1998.

¶11 In June 1999, Ralph moved for partial summary judgment on Counts I, II and IV and dismissal of Dugan's counterclaims. Dugan objected and moved for partial summary judgment on Counts II, III and IV. The parties presented oral arguments in August 1999. The

6

court directed the parties to arrange for a formal settlement conference, which was held in February 2000 and followed by a telephone conference. Both attempts proved unsuccessful. The parties then filed proposed findings of fact and conclusions of law.

¶12 By summary judgment on November 20, 2000, the District ruled in favor of Ralph on Counts I, II, and IV, and dismissed Count III for violation of the statute of limitation. The court dismissed Dugan's cross-motion for partial summary judgment and each of his counterclaims. The Order directed Ralph to file affidavits calculating accrued interest and supporting his request for attorney fees on Counts I and II. On the same day, the Honorable James E. Purcell recused himself from the case in anticipation of stepping down from the bench. On November 29, 2000, Ralph filed a motion for entry of judgment with affidavits documenting interest accrual, court costs and attorney fees. Judge Purcell signed the judgment *nunc pro tunc* on December 1, 2000, and assessed Dugan $100,897.62 in fees for Ralph's attorneys. Dugan immediately filed for relief from judgment, arguing that the court afforded him insufficient time to file a brief in response to Ralph's motion for entry of judgment and that the amount of attorney fees was unreasonable. The Honorable Edward P. McLean assumed jurisdiction on December 11, 2000. Judge McLean denied Dugan's motion for relief and assessed an additional $1,231.90 in fees.

¶13 We restate the issues raised by Dugan on appeal as follows:

7

¶14 Issue 1. Did the District Court err by granting summary judgment to Ralph and dismissing Dugan's counterclaims?

¶15 Issue 2. Did the District Court err by declining to enforce a settlement agreement?

¶16 Issue 3. Did the District Court err by relying on inadmissible evidence?

¶17 Issue 4. Did the District Court err by entering judgment before Dugan responded to the motion for entry of judgment?

*¶18* Issue 5. Did the District Court abuse its discretion by awarding unreasonable attorney fees?

## STANDARD OF REVIEW

¶19 Our standard of review for a district court's order granting summary judgment is *de novo,* using the same Rule 56, M.R.Civ.P., criteria applied by the district court. *Abraham v. Nelson*, 2002 MT 94, ¶ 9, 309 Mont. 366, ¶ 9, 46 P.3d 628, ¶ 9. We look to the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits to determine the existence or nonexistence of genuine issues of material fact. *Erker v. Kester*, 1999 MT 231, ¶ 17, 296 Mont. 123, ¶ 17, 988 P.2d 1221, ¶ 17.

¶20 Summary judgment is an extreme remedy which should be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Lee v. USAA Casualty Insurance Co.*, 2001 MT 59, ¶ 25, 304 Mont. 356, ¶ 25, 22 P.3d 631, ¶ 25. The party seeking summary judgment, therefore, has the burden of demonstrating a complete absence of any genuine factual issues. *Lee*, ¶ 25. The party seeking summary judgment

8

also must overcome the burden that all reasonable inferences that might be drawn from the offered evidence will be drawn in favor of the party opposing summary judgment. *Lee*, ¶ 25.

¶21 Where the moving party is able to demonstrate that no genuine issue as to any material fact remains in dispute, the burden shifts to the party opposing the motion. *Lee,* ¶ 26. This burden shift requires that the opposing party present material and substantial evidence, rather than merely conclusory or speculative statements, to raise a genuine issue of material fact. *Lee,* ¶ 26.

¶22 This Court has routinely stated that the purpose of summary judgment is to eliminate unnecessary trials, but that summary adjudication should "never be substituted for a trial if a material factual controversy exists." *Boyes v. Eddie*, 1998 MT 311, ¶ 16, 292 Mont. 152, ¶ 16, 970 P.2d 91, ¶ 16 (citation omitted). Because the practical result of applying the summary judgment remedy is to deprive the party against whom judgment is granted of a trial in the usual course, the remedy should be used only in those cases in which the justice of its application is clear.

### *Issue 1.*

¶23 ***Did the District Court err by granting summary judgment to Ralph and dismissing Dugan's counterclaims?***

¶24 Dugan first claims that the District Court committed reversible error by adopting the findings of fact and conclusions of law prepared by Ralph. This assertion is not supported by the law.

¶25 Rule 52(a), M.R.Civ.P., states, in pertinent part:

> The court may require any party to submit proposed findings of fact and conclusions of law for the court's consideration and the court may adopt any such proposed findings and conclusions so long as they are supported by the evidence and law of the case.

¶26 We have held that a court's adoption of the findings and conclusions presented by the prevailing party is not grounds for reversal. *In re Marriage of Nikolaisen* (1993), 257 Mont. 1, 5, 847 P.2d 287, 289. Instead, we examine whether the findings are sufficiently comprehensive, pertinent and supported by substantial evidence to provide a basis for the decision. *Nikolaisen,* 257 Mont. at 5, 847 P.2d at 289 (citing *In re Marriage of Hurley* (1986), 222 Mont. 287, 296, 721 P.2d 1279, 1285).

¶27 The District Court resolved this case by adopting, virtually verbatim, the findings of fact and conclusions of law prepared by Ralph. While the court's findings are sufficiently comprehensive and pertinent, the court employed an incorrect legal standard for summary judgment. Rather than ascertaining whether genuine issues of material fact remained, the court's Findings of Fact, Conclusions of Law and Order reveal that the court weighed the evidence to reach conclusions supported by substantial, but nonetheless disputed, evidence.

¶28 The claims asserted in this action arise from a complicated series of financial transactions spanning many years and encompassing the purchase and operation of three car dealerships and the merger and sale of two. While the District Court's wholesale adoption of the plaintiffs' proposed findings and conclusions does not, in and of itself, constitute reversible

10

error, the importation of an incorrect legal standard resulted in an incorrect analysis. Using the *de novo* standard of review outlined above, we have examined the record on appeal to determine whether the moving party was entitled to summary judgment as a matter of law.

*Count I*

¶29 Ralph presented an executed promissory note from Capital Ford to Wild West Motors and a signed guaranty to document the 1987 loan to Dugan in the amount of $141,861.14. Ralph alleged in his Amended Complaint that the loan was in default as of June 1995. Dugan admitted an unpaid balance of $57,683.62. Consequently, Ralph met his initial burden of demonstrating the undisputed existence of a $57,683.62 debt.

¶30 The burden then shifted to Dugan to demonstrate by more than mere denial, speculation or conclusory statement that a genuine issue of material fact existed to preclude summary judgment. Dugan raised the affirmative defense of accord and satisfaction, claiming that Ralph had promised to forgive the debt in exchange for Dugan's forbearance in exercising his interest in purchasing Capital Ford under the terms of the MOU. When Dugan learned in 1995 that Ralph was engaged in negotiations for the sale of the Helena dealership to a third party, Dugan stated that he twice wrote to Ralph's attorney and presented two forbearance offers. The attorney forwarded Dugan's letters to Ralph, but the record contains no evidence that Ralph responded to Dugan's offers. Dugan presented no evidence that the Count I obligation was released by Ralph or in

11

any way connected to the MOU. Because Dugan failed to offer factual support for his defense of accord and satisfaction, his admission that the unpaid balance on the Count I loan was $57,863.62 stands as uncontroverted fact.

¶31 Dugan also asserts on appeal that the Count I debt should be set off against the damages resulting from Ralph's alleged breach of the MOU. However, Dugan's counterclaim for breach of contract must be established before set off may be considered. We affirm the District Court's grant of summary judgment in Ralph's favor on Count I.

*Count II*

¶32 Ralph and Dugan both moved for summary judgment on Count II, and the District Court ruled in Ralph's favor. To meet his initial burden, Ralph presented a promissory note documenting the 1987 loan by Capital Ford to Capital Imports in the amount of $288,812.30, together with a signed guaranty. Ralph asserted that the loan was in default as of February 1989, with an unpaid balance of $181,963.00. He stated that he received no payments on the loan after the sale of Capital Imports and that he never forgave the debt.

¶33 Dugan countered in his Amended Answer that "the obligation of Capital Imports was satisfied at such time as the business of Capital Imports was merged with Capital Ford, and in consideration of that transaction." He argued that Capital Ford assumed liability for the Count II loan as part of its acquisition of Capital Imports in 1989 and, when Capital Ford paid off Ford Credit

12

in full after the asset sale, Dugan's liability as a guarantor was extinguished. To substantiate his argument, Dugan cited his affidavit, where he stated:

> Capital Ford purchased Capital Imports in 1989, assuming all liabilities, including the debts alleged in Counts II and IV. Capital Imports is no longer a going concern. After the purchase, Capital Imports made no further payments or distributions.

Dugan also cited the following excerpt from his deposition testimony:

> MR. CANNON [attorney for Ralph]: This $288,812.30 is still owing to Capital Ford Sales? You haven't paid it?
>
> A. [DUGAN]: Well, I think if you get the document that was prepared-the sale document between Capital Ford and Capital Imports-you will find that the note was assumed by Capital Ford.
>
> Q. That's this contract of sale that you're speaking of, I assume?
>
> THE DEPONENT: You know, I think we have covered this territory previously, but I don't know-I don't know where to look for it.
>
> MR. WOLD [attorney for Dugan]: I think your answer is just fine.
>
> THE DEPONENT: Okay.
>
> MR. CANNON: Are you saying that there should be an instrument somewhere that in-in which it specifically says that Capital Ford Sales forgives indebtedness?
>
> A. I believe this instrument (indicating)-
>
> Q. Says that somewhere?
>
> A. No. There is no forgiveness. They took it-They took it over.
>
> Q. And therefore it's no longer a debt owing from you to Capital Ford Sales; is that your position?
>
> A. I believe that's how it's handled, yes.

13

¶34 The First Amended Contract for Sale of Assets of Capital Imports to Capital Ford ("Contract for Sale") states that the transfer was to be "free of all debts and encumbrances except those expressly assumed." The Contract purchase price was $857,107.05, which equaled the listed value of the assets sold. Capital Ford also expressly assumed $973,207.00 in liabilities from Capital Imports as part of the acquisition. The list of existing creditors attached to the Contract for Sale included a $66,655.23 debt to Capital Ford and two debts to Ford Credit in the amounts of $572,900.05 and $290,502.00.

¶35 In 1987, Ford Credit provided the financing that permitted Capital Ford and Ralph to make the loan to Capital Imports that is the subject of Count II. While the Contract for Sale did not specifically enumerate the outstanding balance on the Count II loan as a liability on the list of existing creditors when the dealerships merged, Dugan contends that this debt was subsumed within the obligations to Ford Credit and Capital Ford that Capital Ford expressly assumed.

¶36 We first examine whether either party successfully demonstrated a complete absence of issues of material fact. While Ralph's sworn testimony that he did nothing to forgive Dugan's Capital Imports debt remained undisputed, Dugan raised the defense of debt assumption, which Ralph denied. Dugan's sworn assertion that Capital Ford assumed the liability for the Count II debt by executing the 1989 Contract for Sale conflicts with Ralph's contention that Capital Imports had no legal basis for ceasing to

14

make payments on the obligation when this merger with Capital Ford occurred. The Contract for Sale's inclusion of the debts that existed between the two dealerships and with Ford Credit is subject to interpretation and cannot be resolved given the conflict in the parties' sworn testimony. Therefore, we conclude that neither party demonstrated an absence of genuine issues of material fact.

¶37 The District Court in its findings and conclusions consistently mischaracterized Dugan's position as an assertion that the Count II obligation had been forgiven by Ralph. Debt forgiveness and debt assumption are wholly different defenses requiring different proofs. Whereas an obligation of a debtor is released by a creditor only upon the acceptance of new consideration or in writing, *see* § 28-1-1601, MCA, an obligation may be transferred with the consent of the party entitled to its benefits, *see* § 28-1-1002, MCA. Dugan maintained that Ralph's consent to the transferred liability for Capital Imports' debt was manifested by the Contract for Sale. However, the court overlooked the legal theory propounded by Dugan, revealing its misunderstanding of the dispute between the parties. As a result, the court failed to hold Ralph to the requirement that he demonstrate that all facts material to the substantive law raised by Dugan's defense were undisputed. We reverse the grant of summary judgment in Ralph's favor and remand Count II for trial.

*Count IV*

¶38 Both Ralph and Dugan also moved for summary judgment on Count IV. Ralph alleged that Dugan defaulted on the entire $75,900.98

15

loan extended to Dugan personally from Capital Ford as part of the disbursement of the Ford Credit recapitalization loan in 1987. Ralph asserted that the personal loan to Dugan was used to pay-off a $55,900.98 balance that remained on the note with Norwest Bank of Kalispell that Ralph had co-signed in 1982 for the purchase of Big Mountain Toyota. The remaining $20,000 of the personal loan was used to reduce the mortgage on Dugan's home. Because the Count IV loan was not evidenced by a promissory note, Ralph attached various financial records prepared by Capital Ford's accountant to his opening and reply briefs in support of his motion for summary judgment. Dugan challenged each of these exhibits as unauthenticated and inadmissible for lack of proper foundation.

¶39    In his Amended Answer Dugan acknowledged that he received the Count IV personal loan in 1987 as part of the refinancing provided by Ford Credit. However, he denied that he used the loan to pay-off Norwest Bank of Kalispell for his Wild West Motors stock purchase and instead asserted that he had used the money to pay-off Norwest Bank of Helena for his 1984 Capital Imports stock purchase. In his Amended Answer to the Count IV allegations, Dugan explained:

> In approximately 1984, Ralph Anderson and Dugan Anderson jointly borrowed $75,000.00 from Norwest Bank for the purpose of buying stock in Capital Imports, 51% of which was for the benefit of Dugan Anderson, and 49% of which was for the benefit of Ralph Anderson. This debt obligation was assumed by Capital Ford at such time as

16

the business of Capital Imports was merged with Capital Ford, and in consideration of that transaction.

By affidavit, Dugan declared:

I had borrowed money from Norwest for part of my purchase of Capital Imports stock; the balance at the time of the refinance was $55,900.98. I had also borrowed from Norwest for part of the purchase of my home; the balance at the time of the refinance was $20,000. As part of the refinance, my note related to Capital Imports was forgiven. I then paid off the home loan. All other indebtedness by Ralph, my brother David, me, my wife, Capital Imports, and Wild West to Norwest Bank was released, with the exception of two smaller loans not at issue here.

Dugan further asserted that the portion of the Count IV obligation he used to purchase Capital Imports stock had been assumed by Capital Ford as part of the 1989 acquisition and merger.

¶40 While Ralph failed to establish the purpose, disposition or lack of payment on the alleged $75,900.98 obligation with uncontroverted evidence, Dugan also failed to demonstrate an absence of a genuine issue of material fact under his theories of debt assumption, payment or forgiveness. For example, Dugan's sworn assertion that he paid the $20,000.00 home mortgage loan in full does not trump Ralph's sworn statement that Dugan never repaid the obligation, when no other evidence supports either claim. On cross-motions for summary judgment, both parties enjoy the benefit

17

of all reasonable inferences drawn from the evidence presented. We conclude that neither party met their initial burden and that genuine issues of material fact exist. We reverse the entry of summary judgment in Ralph's favor on the Count IV loan and remand for trial.

*Counterclaims*

¶41  In his Amended Answer, Dugan counterclaimed for deprivation of business opportunity and profit and deprivation of the right to purchase Capital Ford under the terms of the MOU, which resulted from Ralph's breach of contract, misrepresentation and constructive discharge of Dugan as general manager of Capital Ford.  Dugan contended that the sale of the Helena dealership to a third party without a release from the terms of the MOU that obligated Ralph to sell the business to Dugan entitles Dugan to reliance and expectancy damages.  Ralph moved for dismissal of all counterclaims, which the District Court granted on summary judgment.

¶42  The District Court excerpted Dugan's deposition testimony at length in its findings and conclusions.  Dugan stated in his deposition that he could not think of any actual business opportunities that he had foregone as a result of his employment with Capital Ford.  Later, he neither supplemented nor contradicted this testimony by affidavit or in his briefs.  The court also referenced Dugan's deposition testimony regarding the circumstances of his departure from the Helena dealership in March 1995.  Although Dugan declared that working with Ralph was untenable and resulted in Dugan's constructive discharge, Dugan also stated that he could not think of any examples of acts or omissions by Ralph that created an intolerable employment situation.

¶43  The District Court noted that the MOU for the purchase of Capital Ford demanded that Dugan take affirmative action to carry

out the intent of the agreement. Before the MOU would compel Ralph to surrender his operational authority and resign as an officer and director, the agreement required Dugan to arrange for the transfer of Capital Ford's dealership sales and service agreements from Ralph to Dugan, to obtain life insurance coverage for himself, and to execute a stock redemption agreement with Ralph for the purchase of Ralph's interest. Dugan acknowledged in his deposition that he did not apply for the transfer of the franchise agreements with Ford Motor Company. He also stated that he and Ralph had discussed the Capital Ford buy-out arrangements over the years, but had reached no agreement.

¶44 Consequently, we conclude that the uncontroverted evidence shows that Ralph met his burden of demonstrating the counterclaims lack any basis in fact. Dugan presented no evidence in rebuttal that supported his counterclaims or established a genuine issue of material fact. Therefore, we affirm the District Court's dismissal of Dugan's counterclaims by summary judgment.

### Issue 2.

¶45 **Did the District Court err by declining to enforce a settlement agreement?**

¶46 Dugan grounded his cross-motion for summary judgment on Counts II and IV on an alternative theory that Ralph was "bound by [his] counsel's agreement to dismiss those counts." The District Court concluded that Counts II and IV were not effectively dismissed by agreement. On appeal, this Court will affirm the court's ruling if the court reached the correct result, even if it did so for the wrong reasons. *Eschenbacher v. Anderson*, 2001 MT 206, ¶ 40, 306

Mont. 321, ¶ 40, 34 P.3d 87, ¶ 40.  *See State v. Parker,* 1998 MT 6, ¶ 20, 287 Mont. 151, ¶ 20, 953 P.2d 692, ¶ 20 (citation omitted).  In order for Dugan to prevail on his cross-motion for partial summary judgment, he must demonstrate that no genuine issue as to any material fact regarding the existence of a binding agreement to settle the Count II and IV claims remains in dispute and that he is entitled to judgment as a matter of law.

¶47  Dugan claims that Ralph's counsel, Patrick Hooks, offered to dismiss Counts II and IV without condition in April 1997, and counsel for Dugan unconditionally accepted the offer.  Ralph counters that he never consented to a final settlement agreement, regardless of his attorneys' representations.  Citing § 37-61-401(1), MCA, as authority, Ralph argues that any agreement reached by his attorney is not binding because no agreement was filed with the clerk of the court or entered into the minutes of the court.

¶48  Section 37-61-401(1), MCA, states, in pertinent part:

> An attorney and counselor has authority to: (a) bind his client in any steps of an action or proceeding by his agreement filed with the clerk or entered upon the minutes of the court and not otherwise. . .

Years ago, this Court observed that "a literal construction [of the above statute] would greatly retard the business of the court and lead to absurd consequences.  Every admission, consent or agreement made in the course of the trial would either have to be reduced to writing or filed with the clerk or by the clerk entered in his minutes.  It was never intended that the section should receive such a construction."  *State v. Turlok* (1926), 76 Mont. 549, 563,

21

248 P. 169, 175 (citation omitted). In practice, § 37-61-401(1), MCA, is applied solely to agreements between attorneys. *State v. Nelson* (1991), 251 Mont. 139, 141, 822 P.2d 1086, 1087 (citing *St. Paul Fire & Marine Ins. Co. v. Freeman* (1927), 80 Mont. 266, 274-75, 260 P. 124, 127; *Bush v. Baker* (1913), 46 Mont. 535, 544-46, 129 P. 550, 553-54). The purpose of the statute is to relieve the presiding judge of the burden of determining disputes between attorneys concerning their unexecuted agreements. *Nelson*, 251 Mont. at 141, 822 P.2d at 1087 (citing *Bush*, 46 Mont. at 540, 129 P. at 553).

¶49 An agreement to settle is binding if made by an unconditional offer and accepted unconditionally. *Hetherington v. Ford Motor Co*. (1993), 257 Mont. 395, 399, 849 P.2d 1039, 1042. The parties must consent to all terms before a settlement agreement becomes binding. *In re Estate of Goick* (1996), 275 Mont. 13, 23, 909 P.2d 1165, 1171. *See also* §§ 28-2-501 and -504, MCA. Because a settlement agreement reached by the respective attorneys becomes binding on the parties *only* when the parties consent to all terms, the agreement is not one that exists solely between the attorneys and need not be "filed with the clerk or entered upon the minutes of the court" to be valid, as contemplated by § 37-61-401(1), MCA. In this case, the existence of a binding agreement between Ralph and Dugan to settle the Count II and IV claims may be demonstrated by evidence of the unconditional acceptance of an unconditional offer by the parties.

¶50 Dugan argues that Ralph's acquiescence to the settlement agreement is demonstrated by his deposition testimony, taken on April 11, 1997, during which Ralph failed to protest his attorney's statement that Count II would be dismissed. The testimony reads:

> Q. [MR. WOLD, attorney for Dugan]: Let's move on to the second claim, which is one for $288,812.30, which is, according to the Complaint, the subject of a promissory note attached to the Complaint as Exhibit C. For the purposes of the record, I'll ask whether you are going to maintain that claim after this point? Either of you can answer that.
>
> MR. HOOKS [attorney for Ralph]: I'll answer. The claim will be dismissed.
> Q. [By MR. WOLD]: So, as a result of that representation, which I accept, I'm not going to ask any questions about that claim. We've just saved ourselves quite a bit of time.
>
> A. [By RALPH]: And I've lost $282,000 [sic].
>
> Q. [By MR. WOLD]: Well, let's move on . . .

¶51 As further proof of settlement, Dugan stated that Hooks confirmed the agreement to dismiss Counts II, III and IV in a letter dated May 14, 1997. Although Dugan referenced a copy of this May 14 letter as an attachment to his brief on cross-motion for summary judgment, the letter is not included in the record on appeal. By affidavit, Douglas J. Wold, Dugan's attorney, stated that Hooks offered to dismiss Counts II and IV without condition and that Wold confirmed his clients' acceptance of the offer on May 15, 1997. The affidavit continues, "Mr. Hooks and I agreed that no written dismissal or release was necessary, and that instead, the two counts would be omitted when the pretrial order was prepared."

23

¶52 Another letter to Dugan's attorney from Hooks, dated May 28, 1997, states that Ralph was willing to dismiss Counts II, III and IV on the condition that Dugan disclaim any interest in Ford Country, Inc., the real estate holding entity associated with Capital Ford. No response to this offer is included in the record and Dugan never asserted that he accepted this settlement proposal unconditionally. Although no other settlement offer or evidence of acceptance is in evidence, attorneys representing both parties informed the District Court judge by mail in July 1997 that three of the four counts had been eliminated from the litigation. These letters do not indicate which counts were to be dropped and which remained for trial.

¶53 Although the record includes various expressions of intent to settle by both parties, evidence concerning the agreement and the terms thereof are not consistent. By way of examples, the letters between counsel and from counsel to the judge demonstrate that the attorneys concurred that a settlement had been reached, which is supported by the Wold affidavit, but a meeting of the minds on the terms of the settlement is not demonstrated. The Wold affidavit states that the parties' settlement agreement was affirmed by May 15, 1997, yet Ralph sent Dugan another conditional offer to settle two weeks later on May 28, 1997. The May 28 letter raises a genuine issue of fact regarding Dugan's claim that the parties had reached an unconditional agreement prior to that date. We note that Dugan did not file a motion to compel settlement following Ralph's dismissal of counsel in August 1997, but proceeded with

24

discovery. And, finally, the parties filed no pretrial order, stipulation, motion for dismissal or amended pleading that expressed an intention to delete Counts II or IV from the litigation.

¶54 Therefore, we conclude that Dugan did not meet his burden by demonstrating that an unconditional offer to settle was unconditionally accepted. The factual dispute precludes summary judgment as a matter of law, and the District Court was correct to refuse to dismiss Ralph's Count II and IV claims on the basis that the parties had already settled the claims. We affirm the court's denial of Dugan's cross-motion. Because we are reversing the entry of summary judgment in Ralph's favor on Counts II and IV, the issue of a settlement agreement may be raised again upon remand.

25

## CONCLUSION

¶55  In conclusion, we reiterate that a court's role on summary judgment is not to weigh the evidence, which occurred here, but to save all parties involved the expense and time of taking a case to trial when no material issues of fact remain in dispute. Uncontroverted evidence sustains the District Court's grant of summary judgment in favor of Ralph on Count I and dismissal of all counterclaims.  However, the record raises genuine issues of material fact regarding Counts II and IV as well as the purported agreement to settle these two claims.  Additional proceedings are required to resolve these matters.

¶56  We remand to the District Court without discussing the merits of the final three issues.  We reached our decision to reverse on Counts II and IV without reference to the evidence challenged by Dugan.  Therefore, it is not necessary for us to decide whether the District Court improperly considered unauthenticated exhibits that were submitted without proper foundation.  However, our holding necessitates reversal of the District Court's award of attorney fees to Ralph, as the award was premised upon multiple claims that Ralph had prevailed upon, two of which are now reversed and remanded.  Thus, the issue of attorney fees will need to be resolved by further proceedings in the District Court.

¶57  Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.


/S/ JIM RICE

26

We concur:


/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ JIM REGNIER
/S/ TERRY N. TRIEWEILER