No. 02-582

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 153

HIDDEN HOLLOW RANCH,

       Plaintiff and Appellant,

  v.

GREGORY W. FIELDS,

       Defendant and Respondent.

APPEAL FROM:    District Court of the First Judicial District,
                In and For the County of Broadwater, Cause No. DV 2001-19,
                Honorable Jeffrey M. Sherlock, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

              John P. Poston, Attorney at Law, Helena, Montana

       For Respondent:

              John E. Bloomquist, Doney, Crowley, Bloomquist & Uda, P.C.,
              Helena, Montana

Submitted on Briefs:   January 9, 2003

Decided:   June 15, 2004

Filed:

_____
                       Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1      Hidden Hollow Ranch (Hidden Hollow) brought this action in the Montana First Judicial District, Broadwater County, requesting an order holding Gregory W. Field (Field) in contempt of court for violating the provisions of the Confederate Creek Water Cases, Consolidated Decrees of 1918 and 1931 (Confederate Creek Decree), and requiring Field to install measuring devices to ensure proper distribution of water in the future. Following a bench trial, the District Court entered findings of fact and conclusions of law dismissing Hidden Hollow's petition and enjoining Hidden Hollow from interfering with Field's diversion works and water conveyance system. The District Court further ordered the Water Commissioner, Tom O'Donnell (O'Donnell), to take all acts necessary to ensure that Hidden Hollow not manipulate or modify Field's diversion system and to see that Field allow 0.83 miner's inches of water to be distributed through the diversion system to Hidden Hollow. From these findings of fact and conclusions of law, Hidden Hollow appeals. We affirm.

¶2      Hidden Hollow raises numerous issues on appeal, which we restate as follows:

¶3      1. Did the District Court exceed its jurisdiction under § 85-2-406, MCA, and re-adjudicate either party's underlying water rights as previously decreed in the Confederate Creek Decree?

¶4      2. Did the District Court err in denying Hidden Hollow's motion to certify the issue involving the controversy as to the source of the parties' respective water rights to the Chief Water Judge?

2

¶5    3. Did the District Court erroneously shift the burden of proof to Hidden Hollow, in contravention to § 85-2-411, MCA, to prove how much water Hidden Hollow contributed to the natural drainage from its independent source?

¶6    4. Did the District Court's order regarding Hidden Hollow's water right deprive Hidden Hollow of due process of law by ruling on issues not raised by the pleadings?

## BACKGROUND

¶7    The current dispute, concerning the appropriate distribution of the water of Confederate Creek and its tributaries, relates back to the Confederate Creek Decree entered by the First Judicial District Court, Broadwater County, in consolidated Cause Numbers 1918 and 1931, on September 24, 1940. In that decree, the District Court decreed the water rights of Confederate Creek and its tributaries to the predecessors in interest to Hidden Hollow and Field.

¶8    Hidden Hollow's right is found in findings of fact numbers 13 and 18 in the decree. Finding of fact number 13, setting a priority date of June 1, 1867, decreed the interest of Howard Matthews, Hidden Hollow's predecessor in interest, and provides:

> That Howard Matthews is the owner of, and entitled to the beneficial use and enjoyment of, and the right to use, [t]wenty-five (25) miner's inches of the waters of Clear Creek, a tributary of Confederate Creek, which said right was initiated and perfected as of June 1, 1867, for the beneficial use upon the:

> N½ Sec. 22;
> E½NE¼ Sec. 21, T. 9, N.R. 2 E.

> Said water is to be diverted through ten (10) ditches coming out of the creek, some on the south side of the creek and some on the north side of the creek, all of said diversion points being in the:

3

N½ Sections 21 and 22;
W½ Section 23, T. 9, N.R. 2 E.

¶9     Finding of fact number 18, setting a priority date of June 1, 1869, provides:

> That Howard Matthews is the owner of, and entitled to the beneficial use and enjoyment of, and the right to use, [t]wenty-five (25) miner's inches of the water of Clear Creek, a tributary of Confederate Creek, which said right was initiated and perfected as of June 1, 1869, for beneficial use upon the:

> N½ Sec. 22;
> E½ NE¼ Sec. 21, T. 9, N.R. 2 E.

> Said water is to be diverted through ten (10) ditches coming out of the creek, some on the south side of the creek and some on the north side of the creek, all of said diversion points being in the:

> N½ Sections 21 and 22;
> W½ Sec. 23, T. 9, N.R. 2 E.

¶10     Field's water right is found in finding of fact number 12 in the Confederate Creek Decree. Finding of fact number 12 decreed the interest of Howard Doggett, Field's predecessor in interest, and provides as follows:

> That Howard Doggett is the owner of, and entitled to the beneficial use and enjoyment of, and the right to use, the entire flow of that certain stream designated in the pleadings of said Howard Doggett as Willow Creek, or Willow Canyon Creek, and also known as the headwaters of Clear Creek, and also as Lone Tree Creek, to be diverted from said stream as a point in the:

> NE¼NE¼ Sec. 13, T. 9, N.R. 2 E.,

> at the mouth of the canyon where said stream leaves the upper reaches of the mountain range to the east and south of Confederate Creek, and at the point where the present ditch of said Doggett taps said stream at the date of this decree, and by means of the same diversion now employed by him, and said Howard Doggett is entitled to the beneficial use and enjoyment of the entire flow of said stream, to be diverted by him as aforesaid, prior to the right of any other party to this action, at any time when said Howard Doggett shall

4

have need of such water for beneficial uses, and shall be able to employ and use the same for a beneficial purpose.

Said waters have been appropriated for, and beneficially used upon, and are appurtenant to the:

S½ Sec. 22;
Sections 23-26-27-33-34, T. 9, N.R. 2 E.,
N½ Sec. 4, T. 8, N.R. 2 E.

¶11    Around 1905, Howard Doggett, acting pursuant to the Confederate Creek Decree, diverted the Willow Creek water in a southwesterly direction through a ditch known as the Upper Doggett Ditch.  At the lower end of the Upper Doggett Ditch is a confluence where the ditch turns into a natural drainage area that, for the purpose of the current controversy, was referred to by some witnesses as the South Fork of Clear Creek, but was referred to by Field and his expert simply as an unnamed drainage or a tributary of Clear Creek. [1]

¶12    The Willow Creek water, after flowing through Upper Doggett Ditch, reaches and follows this natural drainage in a westerly direction until it arrives at Field's lower diversion, known as the Lower Doggett Ditch.  The water is then diverted from the natural drainage in a southerly direction through Lower Doggett Ditch until it reaches Horse Creek, after which, it eventually arrives at Field's ranch and is used for irrigation purposes.  Thus, very little water is allowed to bypass Field's lower diversion and travel the remainder of the natural drainage area toward Hidden Hollow's points of diversion located on that drainage.  Much

---

[1] For purposes of this opinion, this Court will use the terms "South Fork of Clear Creek" and "natural drainage" interchangeably as the District Court used both terms in referring to the same channel.

of Hidden Hollow's water is therefore supplied by other tributaries of Clear Creek further north and northwest of Lower Doggett Ditch.

¶13     At the beginning of the irrigation season in the summer of 1999, Field began experiencing a shortage of water from his Willow Creek water source. Upon inspection of his diversion structure at the head of Lower Doggett Ditch, consisting at that time of a primitive earth and rock structure, Field noticed that the structure had been altered to prevent water from passing through Lower Doggett Ditch. At trial Kelly Flynn (Flynn), a shareholder and then vice-president of Hidden Hollow Ranch, testified to having altered the diversion structure to allow water to remain within the natural drainage area and thereby travel down to Hidden Hollow's points of diversion. According to Flynn, the Confederate Creek Decree decreed his right to use up to 50 miner's inches of the flow from this natural drainage.

¶14     Due to the extent of the alteration, Field had a difficult time repairing the structure in a way that allowed the water in the natural drainage to pass through the Lower Doggett Ditch. According to Field's testimony, the diversion structure required almost daily repair throughout the summer of 1999 and into the summer of 2000 because the structure continued to be altered in a manner that diverted water to Hidden Hollow.

¶15     After fixing the diversion structure numerous times in the summer of 2000, Field obtained legal counsel, who sent a letter to Hidden Hollow outlining Field's concerns and requesting that Flynn "cease activities" at Field's lower diversion. The alteration activity at the diversion structure ceased for a short period of time thereafter, but later resumed. As

6

a result of the interference with Field's diversion structure, Field contacted the Department of Natural Resources and Conservation, Trust Land Management Division (the Department), to inquire about appropriate action to cure the problem.[2]

¶16    In June 2000, Tom Hughes (Hughes), a hydrologist for the Department, met with Field to discuss the allegations of trespass and improper diversion of water. Hughes photographed the diversion from Field's conveyance system and suggested that Field replace the earth and rock diversion structure with one constructed from specialized concrete blocks. Based upon Hughes's suggestion and upon the Department's design and direction, Field installed a concrete block diversion structure at his lower point of diversion that effectively diverted all of the water down the channel towards Field's ranch.

¶17    When Flynn discovered the newly installed diversion structure, he contacted Hughes at the Department. Hughes, along with the Water Commissioner, Tom O'Donnell, accompanied Flynn to Field's lower point of diversion to inspect the concrete structure. Following their inspection, O'Donnell instructed Field to install a bypass tube in order to allow approximately 13.2 miner's inches of water to remain in the natural drainage and thereby flow down to Hidden Hollow. Field complied with the order and installed a bypass tube designed to allow the prescribed amount of water to bypass the concrete diversion structure and flow to Hidden Hollow.

_____

[2]The property where the Lower Doggett Ditch begins is situated upon state land leased by Field.

¶18    To control the prescribed flow of water to Hidden Hollow, the bypass tube was equipped with an adjustable valve. Flynn testified that he manipulated the valve on several occasions to allow a greater amount of water to pass through the tube and be diverted to Hidden Hollow because he believed that the Confederate Creek Decree authorized more water than the 13.2 miner's inches prescribed by O'Donnell.

¶19    In response to Flynn's repeated manipulation, Field installed a padlock on the bypass valve. Shortly thereafter, Flynn initiated the proceedings in this matter, requesting the District Court enjoin Field from further interference with Hidden Hollow's water rights and requesting the court to order Field to install a measuring device at the lower diversion to properly measure the water being diverted to Hidden Hollow.

¶20    Following a bench trial, the District Court entered findings of fact and conclusions of law, dismissing Hidden Hollow's petition and enjoining it from further interference with Field's diversion works and water conveyance system. It additionally ordered O'Donnell to take all necessary steps to ensure that Hidden Hollow not manipulate or modify Field's diversion system, except that Hidden Hollow was entitled to receive 0.83 miner's inches of water–the amount which the court determined represented the water coming from an independent spring in Clear Creek and arriving at Field's lower point of diversion. From these findings of fact and conclusions of law, Hidden Hollow appeals.

**STANDARD OF REVIEW**

¶21    We review a district court's findings of fact to ascertain whether they are clearly erroneous. *Habel v. James*, 2003 MT 99, ¶ 12, 315 Mont. 249, ¶ 12, 68 P.3d 743, ¶ 12 . A

8

finding is clearly erroneous if it is not supported by substantial evidence, if the trial court misapprehended the effect of the evidence, or if our review of the record convinces us that a mistake has been committed. *Habel*, ¶ 12. Our standard of review of a district court's conclusion of law is whether the court's interpretation of the law is correct. *Habel*, ¶ 12.

## DISCUSSION

¶22 **Did the District Court exceed its jurisdiction under § 85-2-406, MCA, and re-adjudicate either party's underlying water rights as previously decreed in the Confederate Creek Decree?**

¶23 After extensive fact gathering, the District Court determined that the water diverted from Field's upper diversion system and imported to the natural drainage area constituted "developed" water. The court concluded that, because Field had imported the water from his Willow Creek water source, he was entitled to use this water before all other water appropriators. However, the court also noted the existence of a southern side spring, located along the natural drainage, just above the point at which the waters flowing through the Upper Doggett Ditch turned into the natural drainage. Expert testimony indicated that the spring produced a seasonal flow of 0.83 miner's inches, which, although not likely to reach Hidden Hollow without the benefit of Field's imported water, could be characterized as water naturally occurring in the drainage. The District Court therefore concluded that Field was entitled to all the water available at his lower diversion, less the 0.83 miner's inches coming from the southern side spring.

¶24 On appeal, Hidden Hollow raises several points of error. To begin, Hidden Hollow argues that the District Court exceeded its jurisdiction under § 85-2-406, MCA, in

9

determining that the southern side spring constituted an independent source of water, which produced a seasonal flow of 0.83 miner's inches. It maintains that, under § 85-2-406(2)(b), MCA, controversies over the source of water fall squarely within the jurisdiction of the water court. Second, Hidden Hollow contends that the District Court erroneously classified Field's imported water as "developed water," and improperly applied the law in that regard. Hidden Hollow further argues that the District Court erred in changing the name of its water source to "unnamed drainage," rather than referring to it as the South Fork of Clear Creek. Pervading each point is the contention that the District Court exceeded its jurisdiction under § 85-2-406, MCA, by adjudicating matters within the sole province of the water court. We address each sub-argument of this issue in turn.

¶25 **A.** *Did the District Court exceed its jurisdiction in noting the existence of the southern side spring and determining its flow rate?*

¶26 Hidden Hollow maintains that the District Court exceeded its jurisdiction by recognizing the existence of an independent source of water, otherwise known as the southern side spring, and determining its flow rate. It emphasizes that, pursuant to § 85-2-406(2)(b), MCA, "when a water distribution controversy arises upon a *source of water in which not all existing rights have been conclusively determined* . . . any party to the controversy may petition the district court to certify the matter to the chief water judge." (Emphasis added.) From this language, Hidden Hollow asserts the District Court erred in concluding that Hidden Hollow was entitled to only 0.83 miner's inches of water flowing

10

at Field's lower point of diversion, particularly in light of the fact that the Confederate Creek Decree awarded Hidden Hollow up to 50 miner's inches of water flowing in Clear Creek.

¶27 It is true that the jurisdiction to adjudicate water rights rests exclusively with the water courts. *See Mildenberger v. Galbraith* (1991), 249 Mont. 161, 166, 815 P.2d 130, 134, and *State ex rel. Jones v. District Court* (1997), 283 Mont. 1, 7, 938 P.2d 1312, 1316; *see also* § 85-2-102(10), MCA. However, pursuant to § 85-2-406(3), MCA, and cases decided by this Court, a district court has the authority to supervise the distribution of previously adjudicated water or to enforce an existing water decree, and may in certain cases fill in a pre-1973 decree with further delineations, such as time or season of use and acreage of application. *In re Deadman's Basin Water Users Ass'n*, 2002 MT 15, ¶ 15, 308 Mont. 168, ¶ 15, 40 P.3d 387, ¶ 15.

¶28 In this case, we conclude that the District Court was merely enforcing the distribution of water as ordered by the 1940 decree, and thus did not exceed its jurisdiction in determining the source and flow of the water coming from the southern side spring. Section 85-2-406(3), MCA, provides that controversies between appropriators from a source that has been the subject of a final decree must be settled by the district court. Here, the controversy stems from water flowing from the previously adjudicated tributaries of Confederate Creek, and concerns the amount of water Field is entitled to withdraw from the natural drainage by virtue of his superior water rights in Willow Creek, a tributary of Confederate Creek. However, in order to accurately distribute decreed water between Field and Hidden Hollow, it was necessary for the District Court to identify water that was naturally present in the

11

drainage, as distinguished from the water produced by Field's diversion works. Upon weighing the evidence presented, the court determined that the water flowing from the southern side spring was independent from Field's developed water and was water which could be characterized as naturally occurring in the drainage above Field's lower diversion. The court further noted that the drainage would be dry but for Field's developed water and the water flowing from the independent spring, and therefore concluded that Field was entitled to all of the water present at his lower diversion with the exception of 0.83 miner's inches, the amount flowing from the southern side spring. Recognition that the 0.83 miner's inches flowed from the southern side spring, and was not imported by Field, was therefore a necessary part of enforcing and administering the water rights previously adjudicated in the 1940 decree.

¶29 Furthermore, contrary to Hidden Hollow's assertions, the District Court did not set or decree a permanent "flow rate" of 0.83 miner's inches to Hidden Hollow. Rather, consistent with the Confederate Creek Decree, Hidden Hollow remains entitled to any water flowing through the natural drainage in excess of the amount that Field actually imports, up to 50 miner's inches. This notwithstanding, at the time of the present controversy, the only water present at Field's lower diversion not imported by Field from his Willow Creek water source was the 0.83 miner's inches from the southern side spring. By making this simple determination, the District Court did not "re-adjudicate" previously existing water rights or otherwise modify the 1940 decree in excess of its authority under § 85-2-406, MCA.

12

¶30     **B.** *Did the District Court err in classifying Field's imported water as "developed*

*water," or otherwise err in referring to the natural water carrier as an unnamed drainage?*

¶31     Generally speaking, the idea behind developed waters connotes obtaining water not

previously available. *Smith v. Duff* (1909), 39 Mont. 374, 391, 102 P. 984, 986. Hidden

Hollow argues that the determination of whether the water forming the water right

constitutes developed water rests exclusively within the jurisdiction of the water court and,

in support of its argument, cites *Mungas v. District Court* (1936), 102 Mont. 533, 539, 59

P.2d 71, 73. At issue in *Mungas* was whether the doctrine of developed waters entitled a

prior appropriator to reclaim and use waters in a stream which had been increased by virtue

of percolating and seepage waters which had returned to the natural flow of a stream after

being used for irrigation purposes. In concluding that such waters were available for another

appropriator's use, this Court relied on its earlier holdings in *Popham v. Holloron* (1929),

84 Mont. 442, 275 P. 1099*,* and *Rock Creek Ditch & Flume Co. v. Miller* (1933), 93 Mont.

248, 17 P.2d 1074. In *Popham* we stated,

> Where . . . vagrant, fugitive waters have finally collected and reached a natural
> channel, and thus lose their original character as seepage, percolating, surface,
> or waste waters, and flow with such regularity . . . whether from rains raising
> the surface of a lake until it overflows . . . seepage and percolation forming
> springs . . . surface water collecting in a canyon . . . artificial water over which
> the creator has lost control . . . water from artesian wells accidentally
> developed while drilling for oil . . . or water of a slough fed by seepage from
> irrigation, the waters flowing in such natural channel constitute a watercourse
> within the meaning of the law of water rights.

*Popham*, 84 Mont. at 451, 275 P. at 1102-03 (citations omitted). The Court in *Popham*

accordingly held that waters flowing in such a watercourse, regardless of the original source

13

of the water or the fact that the flow was not continuous throughout the year, was properly subject to appropriation by another user. *Popham*, 84 Mont. at 453, 275 P. at 1103. In *Rock Creek Ditch*, we refined this rule and held that the owner of a water right may collect and recapture water which he is entitled to use so long as the water remains within his or her possession and control. However, once the water gets beyond his control, it becomes waste and is subject to appropriation by another user. *Rock Creek Ditch*, 93 Mont. at 268, 17 P.2d at 1080. Such was the case in *Mungas* where the plaintiff sought to take the increase in the flow of a stream caused solely by percolation resulting from irrigation upon adjacent lands. While this Court recognized that an owner of a water right may employ a natural channel for conveyance of water which one is entitled to use, the waters at issue in *Mungas* were no longer under the possession or control of the original owners, and therefore were subject to appropriation by another user. *Mungas*, 102 Mont. at 538-39, 59 P.2d at 73.

¶32    We agree that a claim for appropriation of water rights where the original character of the water has been lost, or which is no longer under the possession or control of the original owner, should be adjudicated before the water court because, by its nature, it involves a determination of the "source" of the water right. *See* § 85-2-406(2)(b), MCA. In this case, however, the parties do not seek to adjudicate water which has lost its character as seepage, percolating, surface, or waste waters, or which has left the control of the original appropriator. Rather, Field merely seeks to use the water which he has brought into the natural drainage from his Willow Creek water source. The District Court referred to this imported water as "developed water," and in this regard, Hidden Hollow claims the court

14

erred. While we recognize the District Court may have incorrectly described Field's imported water as developed water, we conclude any such error was harmless. This Court has long since held that where water is intentionally emptied into a natural watercourse for conduction to another point, an equivalent amount may be recaptured or diverted at a later point, so long as it does not diminish the rights of prior appropriators. *Mungas*, 102 Mont. at 538-39, 59 P.2d at 73 (citing *Rock Creek Ditch*, 93 Mont. at 262, 17 P.2d at 1078). Furthermore, § 85-2-411, MCA, expressly provides that "water appropriated under an existing right . . . may be turned into the natural channel of another stream . . . for beneficial use . . . ." Accordingly, we conclude the District Court did not exceed its jurisdiction under § 85-2-406, MCA, by referring to the water at issue as developed water. Rather, it appears the court was merely applying nomenclature to an otherwise confusing process.

¶33  Nor are we persuaded by Hidden Hollow's contention that the District Court erred by referring to the natural water carrier as an "unnamed drainage." Although unclear, Hidden Hollow apparently argues that, because Field's upper diversion was not established until 1905, and Hidden Hollow's water rights in Clear Creek have priority dates of 1867 and 1869, Hidden Hollow has priority over all the water flowing in the drainage. However, Hidden Hollow misapprehends the effect of the 1940 decree, which made Field's water rights in Willow Creek superior to all others. Once again, Montana law specifically allows "water appropriated under an existing right . . . [to] be turned into the natural channel of another stream . . . for beneficial use." *See* § 85-2-411, MCA. Because Field retained possession

15

and control over his Willow Creek waters, he did not lose his order of priority merely by channeling this water through the natural drainage.

¶34    Finally, Hidden Hollow appears to argue that, by classifying Field's imported water as "developed water," the District Court erroneously created a new groundwater right in favor of Field.  However, the District Court merely recognized that some of the water imported from Willow Creek would inevitably be lost to underground seepage.  This actually occurred to the benefit of Hidden Hollow, since it would likely recapture some of this water at its later points of diversion.  Nonetheless, Field was entitled to all the water present at his lower diversion, less the water from the independent spring, because the water had been imported by Field from his Willow Creek water source.  Accordingly, we conclude and hold that the District Court did not exceed its jurisdiction under § 85-2-406, MCA, nor re-adjudicate any existing water rights under the Confederate Creek Decree.

¶35    **Did the District Court err in denying Hidden Hollow's motion to certify the issue involving the controversy as to the source of the respective parties' water rights to the Chief Water Judge?**

¶36    Given our resolution of the foregoing issue–that the District Court did not exceed its jurisdiction in recognizing the existence and flow of the southern side spring, but simply administered existing water rights pursuant to the Confederate Creek Decree–we hold the District Court did not err in denying Hidden Hollow's motion to certify the instant controversy to the Chief Water Judge.

¶37    **Did the District Court erroneously shift the burden of proof to Hidden Hollow, in contravention to § 85-2-411, MCA, to prove how much water Hidden Hollow contributed to the natural drainage from its independent source?**

16

¶38     Hidden Hollow contends that, pursuant to § 85-2-411, MCA, the individual asserting that he is entitled to use waters from a natural carrier because of his contributions from another water source bears the burden of proving the amount of water purportedly contributed.  Hidden Hollow argues that the District Court erroneously shifted the burden of proof by requiring it to show the amount of water flowing from the southern side spring, while failing to require Field to prove the amount of subsurface water actually arriving in the natural drainage from his Willow Creek water source.  Hidden Hollow further argues that the District Court erred in failing to credit it for the subsurface waters which it contributed from the independent spring.  Section 85-2-411, MCA, provides in part:

> **Water turned into natural channels.**  Water appropriated under an existing right or pursuant to this chapter may be turned into the natural channel of another stream or from a reservoir into the natural channel and withdrawn or diverted at a point downstream for beneficial use, but the waters of that stream may not thereby be diminished in quantity or deteriorated in quality to the detriment of a prior appropriator.

¶39     We agree that the burden of proof correctly rests on the party asserting he or she is entitled to use waters which have been released into a natural carrier from another water source.  *See Smith,* 39 Mont. at 391, 102 P. at 987 (one who asserts that he is entitled to the exclusive use of water by reason of its development by him must assure the court by satisfactory proof that he is not intercepting the supply to which his neighbor is rightly entitled).  However, we disagree that the District Court erroneously shifted the burden of proof to Hidden Hollow in this regard.  To the contrary, the court weighed the evidence presented at trial and concluded that Field had indeed proved that more water was being

17

imported from his Willow Creek water source than was being diverted at his lower point of diversion.

¶40 At trial, both parties presented expert testimony concerning the source and flow of the water traveling in the drainage area. According to Field's expert, Daniel March, the southern side spring contributed just 0.83 miner's inches of water to the natural drainage and only during seasonal periods. Hidden Hollow's expert, Dave Schmidt, testified that the water flowing in the natural drainage was from several springs located along the drainage area. As the District Court noted, however, Schmidt's measurements failed to account for the influence of the water being imported to the natural drainage by Field. March, on the other hand, had taken measurements at various points throughout the seasons and both at times when water was, and was not, being diverted from Willow Creek. Ultimately, the court was persuaded by March's testimony and concluded that more water was being imported into the natural drainage than was being diverted at Field's lower point of diversion.

¶41 We have stated that, in a non-jury trial, credibility of witnesses and weight of their testimony are matters for the district court to determine. *Frank L. Pirtz Const., Inc. v. Hardin Town Pump, Inc.* (1984), 214 Mont. 131, 135, 692 P.2d 460, 462. In this case, there is no indication that the District Court impermissibly shifted the burden of proof to Hidden Hollow to show the amount of water being contributed to the natural drainage. Rather, Field established the amount of water being diverted into the natural drainage by showing that all but 0.83 miner's inches came from his Willow Creek water source.

18

¶42     Hidden Hollow's contention that the District Court failed to account for its subsurface contributions to the water flowing in the natural drainage is equally without merit. Field testified that, in his observations of the area during all seasons since approximately 1970, the only independent source of water in the drainage area was the southern side spring. In the absence of Field's imported water, the confluence area was dry. Field's observations were confirmed by the water commissioner during a visit to the area in the spring of 2000, and supported by March's measurements and observations. Furthermore, the evidence produced at trial revealed that the small amount of water flowing from the spring would not likely reach Hidden Hollow's later points of diversion without the benefit of Field's imported water. Thus, very little, if any, subsurface water flowing in the drainage was a product of the southern side spring. In light of this evidence, which the District Court found credible, we cannot fault the court for failing to credit Hidden Hollow for its contribution of subsurface water to the drainage area.

¶43     **Did the District Court's order regarding Hidden Hollow's water right deprive Hidden Hollow of due process of law by ruling on issues not raised by the pleadings?**

¶44     Hidden Hollow maintains that the District Court permanently modified the Confederate Creek Decree by declaring that Field is entitled to all but 0.83 miner's inches of water at his lower point of diversion, and argues that such a modification in what is essentially an action for contempt and injunctive relief deprives it of due process of law. Because we conclude the District Court did not permanently modify the Confederate Creek Decree, we disagree that Hidden Hollow was deprived of the procedural and substantive

19

protections embodied by the due process clauses of the Fourteenth Amendment of the United States Constitution and Article II, Section 17 of the Montana Constitution. Accordingly, the decision of the District Court is affirmed.


/S/ JIM RICE


We concur:


/S/ JIM REGNIER
/S/ PATRICIA O. COTTER
/S/ JOHN WARNER
/S/ W. WILLIAM LEAPHART