No. 03-414

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 279

IN THE MATTER OF THE ESTATE OF
ERNESTINE STUKEY,

Deceased.


APPEAL FROM:    District Court of the Eighth Judicial District,
                In and for the County of Cascade, Cause No. ADP-01-068,
                The Honorable Thomas M. McKittrick, Judge presiding.


COUNSEL OF RECORD:

        For Appellant:

            Steven T. Potts, Thompson, Potts & Donovan, Great Falls, Montana

        For Respondent:

            Ward E. Taleff, Alexander, Baucus, Taleff, Paul & Young, PLLC, Great
            Falls, Montana


                            Submitted on Briefs:  January 27, 2004

                            Decided:  October 8, 2004

Filed:


        _____
                            Clerk

Justice Jim Regnier delivered the Opinion of the Court.

¶1 This action arises from a dispute between two wills purportedly executed by Ernestine Stukey (Stukey) and a subsequent settlement conference, involving all parties, wherein the parties agreed and signed a Stipulation and Memorandum of Understanding (Memorandum), which reflected an agreed distribution of assets totaling $1,257,688.20. Many months after the Memorandum, Charlene Howard (Charlene), Stukey's niece, discovered that Evon Leistiko (Evon), Stukey's daughter, failed to disclose that the above amount included annuities and jointly held property that Evon had already received worth approximately $256,000. Charlene disputed that Evon had a right to thereafter reduce the settlement amount by the value of the annuity and joint account proceeds and the District Court agreed. On April 25, 2003, the District Court entered Findings of Fact and Conclusions of Law ordering that the assets be distributed under the Memorandum in the amount that Evon reported in the proposed Final Inventory in the conservatorship proceedings. Evon now appeals. We affirm the District Court.

¶2 We address the following issues on review:

¶3 1. Did the District Court erroneously define the probate estate?

¶4 2. Did the District Court err by applying equitable estoppel?

¶5 3. Did the District Court erroneously conclude Evon Leistiko breached fiduciary duties owed to Charlene Howard?

¶6 4. Did the District Court erroneously conclude Evon's conservatorship accountings and inventories were not complete or verifiable?

2

¶7    5. Did the District Court erroneously conclude Evon misrepresented the extent and value of her mother's assets?

¶8    6. Did the District Court erroneously consider parol evidence and erroneously admit Exhibit 11 into evidence?

¶9    7. Did the District Court err by awarding interest on Charlene's estate distribution?

¶10   8. Did the District Court err by awarding beneficiaries' shares of the estate to Charlene?

¶11   9. Are the District Court's Findings of Fact clearly erroneous?

¶12   10. Did the District Court improperly sign Charlene's proposed orders?

BACKGROUND

¶13   Mrs. Stukey was represented for many years by the law firm of Church, Harris, Johnson & Williams (Church Harris) in Great Falls. Mrs. Stukey signed a will in January 1998, the last will she signed before being declared incompetent and involuntarily committed to the Montana State Hospital at Warm Springs. In that will she disinherited Evon and bequeathed a majority of her estate to Charlene. On June 28, 2000, a conservatorship was filed in Deer Lodge County and Evon was appointed conservator of Mrs. Stukey's estate. Evon thereafter requested Church Harris to provide her with documents and information regarding her mother's assets. Included with these documents was her mother's 1998 will in which Evon had been disinherited.

¶14   Thereafter, without notifying the court or Mrs. Stukey's counsel, Evon moved her mother from Warm Springs, relocated her to Washington state, and placed her in an Alzheimer's unit of an assisted living home. While in the Alzheimer's unit, Mrs. Stukey

3

purportedly signed a new will dated February 12, 2001, bequeathing all of her estate to Evon and her family. Mrs. Stukey remained in the Alzheimer's unit until her death on March 8, 2001. The conservatorship was not terminated nor was the court at any time informed or advised of this purported new will, while at the same time Evon was being investigated for self-dealing with Mrs. Stukey's assets.

¶15 In the conservatorship proceedings in Deer Lodge County, Evon filed an initial inventory representing her mother's assets to be $1,268,899 and her net worth to be $1,254,795. Evon made no reference to any annuities or jointly held property. Evon also filed a petition in the conservatorship to make gifts to her family members of approximately $160,000. The District Court for Deer Lodge County, Judge Mizner presiding, denied the petition. Thereafter, however, the court learned that, subsequent to its order, Evon had made gifts to her family in lesser amounts. As a result, the court directed Mrs. Stukey's attorneys to investigate Evon's conduct. As a result of their investigation, Church Harris filed a motion to remove Evon as conservator and for an accounting.

¶16 After hearing evidence on the motion, Judge Mizner made an express finding that "the Estate of [Ernestine Stukey] is approximately $1,250,000, and said Estate is potentially subject to estate tax, pursuant to Section 2001 of the Internal Revenue Code." Neither Evon or her counsel took any action to dispute that statement.

¶17 Following Mrs. Stukey's death, Church Harris filed a petition in the Eighth Judicial District Court on March 13, 2001, to probate her 1998 will and requesting that Charlene be appointed personal representative. Ten days later, on March 23, 2001, Evon filed a petition in Washington attempting to probate the later will of Mrs. Stukey. Evon represented in that

4

petition that the estate was worth $1,253,000, again making no reference to annuities, beneficiaries or jointly held property. The Washington court entered an order deferring to the Montana court to determine which will would be admitted to probate.

¶18 The parties began negotiations to resolve which will would be admitted to probate and the issues raised in the conservatorship. The parties held a settlement conference on November 12, 2001. As a result of that conference, the Memorandum was drafted intending to reflect the agreement of the parties. The Memorandum did not recite the value of assets or total value of assets in dispute nor did it itemize the assets. Rather, the assets were identified in the inventory Evon had prepared and consisted of accounts with various investment firms.

¶19 The Memorandum set forth certain payments to be made by the estate with the remainder to be divided equally between Charlene and the Leistiko heirs. The Memorandum did not distinguish between probate and non-probate assets. Rather, the assets to be distributed were determined by resorting to inventory reports Evon filed under oath in various courts. The evidence is uncontroverted that Charlene and her counsel understood that the amount which was agreed to be distributed under the Memorandum was the sum Evon reported in her Final Inventory.

¶20 Neither Charlene nor her attorney knew until approximately nine months after the Memorandum was signed that part of the assets Evon had reported under oath were actually annuities and joint tenancy properties which were to be paid to Evon upon the death of her mother. By virtue of being named beneficiary, Evon received the proceeds of the annuities of approximately $256,000 within one week of the mediation. She did not report receiving

5

the proceeds to any party during mediation, to the Washington probate court, to the District Court overseeing the conservatorship, nor to the attorney in the conservatorship proceedings. Evon did present two court documents giving the full value of each of the accounts for which she was the named beneficiary.

¶21 On December 4, 2001, the estate's counsel wrote a letter to William Walsh, the Personal Representative, to advise him that the inventory numbers to be used in the implementation of the Memorandum were taken from Evon's Inventory in the conservatorship proceedings. Copies of this letter were sent to all parties to the mediation. Evon made no response to that letter and in no way disputed that the settlement was to be based upon Evon's own Inventory filed in the conservatorship proceedings. Not until nine months later did Evon and the Leistiko heirs assert for the first time their position that the annuities and joint account proceeds were not part of the settlement.

¶22 Charlene contended in the District Court that Evon did not now have a right to reduce the settlement amount by the value of the annuity and joint account proceeds and the District Court agreed. Evon now appeals. Charlene requests that we award her attorney fees pursuant to Rule 32, M.R.App.P., contending that Evon's appeal was taken without substantial or reasonable grounds.

DISCUSSION

ISSUE 1

¶23 **Did the District Court erroneously define the probate estate?**

¶24 Evon argues that the District Court, in its Finding of Fact No. 7, erroneously defined the probate estate. Finding of Fact No. 7 provides:

6

Neither Evon Leistiko nor her counsel has ever taken any action in the conservatorship or otherwise to contend or advise the court that Ernestine Stukey's estate which is subject to estate tax, meaning assets of the decedent which are required to be probated, was less than the amount of $1,250,000.

Evon contends that the court's conclusion equates "estate subject to tax" with "assets of the decedent which are required to be probated," and, correctly noting that assets subject to estate taxes may be probate or non-probate in nature, contends that the District Court's finding is "flawed" and is "not supported by substantial evidence." *See In re Estate of Marans* (1964), 143 Mont. 388, 389, 390 P.2d 443, 444.

¶25 Charlene responds that the District Court's order merely interpreted the Memorandum and determined the *amount* which had been agreed to be distributed, but made no distinctions between probate and non-probate assets and made no attempt to define the "probate estate." Charlene notes that the District Court's order from which this appeal is taken did not address nor attempt to address which assets were within the probate estate, nor did the Memorandum itself attempt to define or identify the assets in the probate estate, but merely divided the *amount* reflected in Evon's Final Inventory rather than dividing specific probate or non-probate assets contained in the estate.

¶26 We review a district court's findings of fact to ascertain whether they are clearly erroneous. *Hidden Hollow Ranch v. Fields*, 2004 MT 153, ¶ 21, 321 Mont. 505, ¶ 21, 92 P.3d 1185, ¶ 21. A finding is clearly erroneous if it is not supported by substantial evidence, if the trial court misapprehended the effect of the evidence, or if our review of the record convinces us that a mistake has been committed. *Hidden Hollow Ranch*, ¶ 21.

¶27 Given the substantial evidence the division of property via the Memorandum was

7

based solely upon Evon's Final Inventory, we agree that the District Court, in its order, made no attempt to "define" the probate estate or to divide assets between probate and non-probate, but merely enforced the Memorandum as written. Any attributable error to the District Court's reference to "probate" property in Finding of Fact No. 7, is immaterial in light of its finding that Evon made no attempt to inform any party, court, or even her attorney in the conservatorship proceeding, that the amount to be divided via the Memorandum was an amount other than $1,250,000.

¶28 We conclude the District Court did not "improperly define" the probate estate in its findings.

ISSUE 2

¶29 **Did the District Court err by applying equitable estoppel?**

¶30 Evon argues that the District Court erred by applying equitable estoppel in Conclusion of Law No. 3, which provides:

> The amounts representing Ernestine Stukey's assets set out by Evon Leistiko in her inventories in her probate proceedings in Washington and in the conservatorship proceedings before Judge Mizner are conclusively presumed to be correct. Section 26-1-601(1), MCA. Those amounts represent the truth of the declaration or act which she has, by those declarations and acts, intentionally lead another to believe a particular thing true and to act upon such belief. She is bound by them.

Section 26-1-601(1), MCA, provides:

> **List of conclusive presumptions.** The following presumptions are conclusive: (1) the truth of a declaration, act, or omission of a party, as against that party in any litigation arising out of such declaration, act, or omission, whenever he has, by such declaration, act, or omission, intentionally let another to believe a particular thing true and to act upon such belief.

¶31 Additionally, in Conclusion of Law No. 2, the District Court stated that Evon and the

Leistiko heirs did not come to the court with clean hands, but that Evon "made representations to the other parties to the mediation and to two courts regarding her mother's assets. She cannot take advantage of her own wrong." *See* Section 1-3-208, MCA.

¶32 In Conclusion of Law No. 11, the District Court stated that Evon "is estopped from asserting the value of the assets to be distributed as part of the Memorandum of Understanding is less than the amount reported in the proposed Final Inventory she filed in the conservatorship proceedings and the amount reported in the Washington probate estate."

¶33 Finally, in Conclusion of Law No. 13, the court stated that it would be "inequitable to require distribution under the Memorandum of Understanding on any bases other than the value of assets Evon Leistiko represented in sworn statements filed with two courts and provided to the parties to the mediation."

¶34 Evon contends the District Court erred in applying the estoppel doctrine because the facts do not satisfy the six elements required to prove equitable estoppel. *See, e.g., Ducham v. Tuma* (1994), 265 Mont. 436, 441-42, 877 P.2d 1002, 1006, *overruled on other grounds by Shammel v. Canyon Resources Corp.*, 2003 MT 372, ¶ 12, 82 P.3d 912, ¶ 12, 319 Mont. 132, ¶ 12; *Sweet v. Colborn School Supply* (1982), 196 Mont. 367, 372-73, 639 P.2d 521, 524, *affirmed in Dagel v. Great Falls* (1991), 250 Mont. 224, 234-35, 819 P.2d 186, 192-93.

¶35 Charlene responds that, while the District Court did not make any findings or conclusions specifically finding Evon was "equitably estopped," the facts of the present case indeed compel the application of estoppel, whether it be equitable estoppel, judicial estoppel, or promissory estoppel.

¶36 Reading the above four conclusions cohesively, the District Court concluded that

Evon is bound to previous judicial statements and bound by her silent acquiescence during mediation while knowing that the other parties to the mediation assumed that the amount to be divided was the amount in Evon's sworn Final Inventory. The court concluded that, given Evon's silent acquiescence while the other parties relied upon her Final Inventory, it would not be equitable for Evon to take advantage of her misrepresentation by reducing the required distribution under the Memorandum to the detriment of the other parties. We find that such conclusions are tantamount to a finding of equitable estoppel.

¶37    Estoppel, as a principle of equity, will grant relief sought when, in view of all the circumstances, to deny it would permit one of the parties to suffer a gross wrong at the hands of the other party who brought about the condition. *Dagel*, 250 Mont. at 235, 819 P.2d at 193. It is an appropriate remedy if a party is denied the right to prove an otherwise important fact because of something which the party has done or omitted to do. *Elk Park Ranch v. Park County* (1997), 282 Mont. 154, 166, 935 P.2d 1131, 1138. Estoppel is not favored and will be sustained only upon clear and convincing evidence. *Dagel*, 250 Mont. at 235, 819 P.2d at 193.

¶38    The six elements essential to equitable estoppel are: (1) the existence of conduct, acts, language, or silence amounting to a representation or a concealment of a material fact; (2) these facts must be known to the party estopped at the time of his conduct, or at least the circumstances must be such that knowledge of them is necessarily imputed to him; (3) the truth concerning these facts must be unknown to the other party claiming the benefit of the estoppel at the time it was acted upon by him; (4) the conduct must be done with the

10

intention, or at least the expectation, that it will be acted upon by the other party, or under circumstances both natural and probable that it will be so acted upon; (5) the conduct must be relied upon by the other party and, thus relying, he must be led to act upon it; and (6) he must in fact act upon it in such a manner as to change his position for the worse. *Elk Park Ranch*, 282 Mont. at 165, 935 P.2d at 1137-38.

¶39 Looking to the record and the District Court's findings, it is undisputed that Evon, while present at the negotiations that generated the Memorandum, remained silent in regard to whether the $1.2 million amount declared in her Final Inventory included annuities or jointly held property. There is likewise no dispute that Evon had knowledge that the $1.2 million amount she herself submitted under oath to two courts included the annuities and jointly held property, and certainly no dispute that none of the other parties to the negotiations knew of this fact, but rather, acted according to their understanding that the amount represented by Evon in the Final Inventory represented the total amount to be divided.

¶40 Given Evon's silence during negotiations regarding the annuities and jointly held property, combined with her knowledge the other parties were relying on the $1.2 million amount declared in her Final Inventory, Evon cannot dispute that, under the circumstances, it would be both natural and probable that the negotiating parties would act upon such knowledge, which they indeed acted upon.

¶41 Evon argues the sixth essential element for collateral estoppel is the weakest–that there is a lack of any indication that Charlene changed her position for the worse as the result

of Evon's conduct, and that, without proof of detriment, the District Court's finding of collateral estoppel cannot stand. Charlene responds, but for Evon's misrepresentation, she would not have agreed to the settlement, as the result of Evon's misrepresentation amounted to a nearly $150,000 difference in the amount Charlene would receive under the Memorandum agreement.

¶42 We agree that the present circumstances satisfy the final requirement of equitable estoppel. Charlene relied upon Evon's misrepresentations of the value of the estate and agreed to a division of the estate accordingly. To now allow Evon to take advantage of that misrepresentation would make manifest Charlene's detriment. To grant Evon her requested relief would permit Charlene to suffer "gross wrong" by Evon's actions. It was thus appropriate for the District Court to deny Evon the right to prove an otherwise important fact because of her silent acquiescence during negotiations. *See Elk Park Ranch*, 282 Mont. at 166, 935 P.2d at 1138; *Dagel*, 250 Mont. at 235, 819 P.2d at 193.

¶43 We thus conclude that the District Court did not err in its application of equitable estoppel.

### ISSUE 3

¶44 **Did the District Court erroneously conclude Evon Leistiko breached fiduciary duties owed to Charlene Howard?**

¶45 Evon contends that the District Court erred in concluding that she owed a fiduciary duty to any party to the negotiations and specifically to Charlene. Our standard of review of a district court's conclusion of law is whether the court's interpretation of law is correct. *Hidden Hollow Ranch*, ¶ 21.

12

¶46    Evon specifically challenges Conclusion of Law No. 9, which provides:

> A conservator is required to act as a fiduciary and to observe the standards of care applicable to trustees. *In re Estate of Clark* (1989), 237 Mont. 179, 772 P.2d 299; Section 72-5-423, MCA. A conservator owes a duty of loyalty to his or her ward and must not place himself or herself in a position where his or her individual interests conflict with the interests of the ward. Section 72-34-103, MCA; *Id.* In negotiating the Memorandum of Understanding, Evon Leistiko was required to act as a fiduciary for the best interests of her mother's estate rather than for her own personal interests. *Id.* In order to meet that obligation she was required to make a full disclosure to the courts and the other parties to the dispute. She failed to do so and breached that duty.

Evon challenges the District Court's conclusion that she was required to make a full disclosure to "the other parties to the dispute" in order to meet her obligations.

¶47    We do not agree with Evon that the District Court concluded that she owed a fiduciary duty to Charlene. In Conclusions of Law Nos. 7 & 8, the court concluded that a conservator's fiduciary duty included preservation of the protected person's property and to furnish a means, via meticulous record keeping, by which the conservator's work can be independently verified by the court. *See In re Estate of Clark* (1989), 237 Mont. 179, 772 P.2d 299; Section 72-5-423, MCA. The court concluded that Evon's accounts were not complete in regards to the disputed annuities and jointly held property.

¶48    Finally, in Conclusion of Law No. 9, the District Court merely concluded that Evon breached her duties as the conservator of her mother's estate by acting in her own best interests in failing to fully disclose all financial information regarding her mother's estate, either to the court or to the negotiating parties that Evon knew were relying on the information in her Final Inventory.

¶49    The District Court did not err in so concluding.

13

**¶50** **Did the District Court erroneously conclude Evon's conservatorship accountings and inventories were not complete or verifiable?**

¶51 Evon challenges the District Court's Conclusion of Law No. 8, which provides:

> A conservator bears the initial burden of proving that his or her fiduciary duties have been met. *Clark.* To meet that burden, an accounting must be accurate, complete, and verifiable. *Id.* A conservator must keep meticulous accounts of his or her administration of the estate. *Id.* The accounts of Evon Leistiko were not complete or verifiable, especially as they related to the American Express annuity accounts and the Oppenheimer account.

Evon notes the District Court for Deer Lodge County, which presided over the conservatorship, made no such findings or conclusions. Evon also asserts that Charlene introduced no evidence to demonstrate that Evon should have produced or disclosed more or that her conservatorship accountings and inventories were incomplete. Evon further notes that the attorney who prepared the accountings and inventory in the conservatorship proceedings testified the accounts were properly prepared. Finally, Evon argues none of the filings in the conservatorship were intended to indicate which assets were probate assets and which were non-probate assets.

¶52 Charlene responds that, while the Inventory referenced the American Express and Oppenheimer accounts, it is undisputed that the Inventory made no reference to annuities or to joint tenancy properties, thus making them incomplete and unverifiable to others involved in the estate, specifically to those involved in negotiating the Memorandum.

¶53 As there is no dispute that Evon did not make known to the District Court, either in the instant case or in the conservatorship proceedings, nor to the negotiating parties, that the

amount in the Final Inventory included annuities and jointly held property, we cannot conclude that the District Court erred in concluding that Evon's accounts were incomplete and unverifiable. We again reiterate that the District Court made no attempt to separate or define probate verses non-probate property or to divide property along those lines, but merely enforced the Memorandum as written.

¶54 The District Court did not err in concluding that Evon's accounts were incomplete and unverifiable regarding the American Express and Oppenheimer accounts.

ISSUE 5

¶55 **Did the District Court erroneously conclude Evon misrepresented the extent and value of her mother's assets?**

¶56 Evon contends that she had always represented that the value of the estate was approximately $1,250,000, and that she provided photocopies of actual account statements to the Church Harris law firm. She again contends that Charlene has never made a claim for non-probate assets, and that Charlene, at trial, testified to receiving information in January 2000 containing information regarding the annuities and jointly held property.

¶57 Charlene agrees that Evon has always represented, in three court filings in two different courts, that the value of the estate was approximately $1,250,000, but argues that such representation is only partly relevant to the case *sub judice*. More important is that Evon was aware that all parties to the negotiations relied upon this amount in drafting the Memorandum, and not until nine months later did Evon contend that the value of the estate to be divided via the Memorandum was approximately $250,000 less.

¶58 Moreover, while Charlene testified at trial that she received discovery responses from

15

Evon, of which a single page made reference to the existence of annuities, she further notes that the discovery made no reference to Evon as a beneficiary. More relevant to the case at hand, Charlene contends, is Evon's own assertion, despite having claimed to spend a total of nearly eight hours in July and August 2000 with the American Express financial advisor responsible for Mrs. Stukey's accounts, that she herself did not learn of the existence of the annuities or that she was a beneficiary under them until March 2001. Moreover, although claiming to have learned of the annuities in March 2001, Charlene notes that neither Evon nor her attorney informed the other parties to the negotiations of her intent to reduce the divided amount by approximately $250,000, thus reducing Charlene's agreed upon share of the estate.

¶59    Charlene points to two undisputed facts which demonstrate Evon's misrepresentation: first, Evon knew the only information available to the negotiating parties regarding the value of the estate was Evon's Inventories, and knowing the amount included probate and non-probate assets, silently acquiesced; and second, that on November 11, 2001, following the mediation, Glenn Tremper, counsel for the estate, wrote to Evon's counsel specifically confirming the settlement reached was based upon the value of the estate as set forth by Evon in her Final Inventory, and requested a response if Evon or the Leistiko heirs had a different understanding. Neither Evon nor her counsel responded to the letter to inform any party the amount to be divided in the Memorandum was anything less than as stated in the Final Inventory.

¶60    Charlene notes it was not until July 2002 that the Personal Representative alerted

Charlene to the annuities and jointly held property and Evon's status as a beneficiary, and not until August 30, 2002, that Evon filed a petition requesting only the probate property be subject to the Memorandum.

¶61 It is not this Court's role to resolve factual disputes and we will not overturn a district court's finding unless it is clearly erroneous. *Hidden Hollow Ranch*, ¶ 21. The District Court's finding that Evon knew at the time of the negotiations the parties were relying on her Final Inventory and she knew the amount in the Inventory included the annuities and jointly held property, is supported by substantial evidence. Evon's argument that Charlene has never made a claim for non-probate property is immaterial and not at issue.

¶62 The District Court's conclusion that Evon's silence equated to misrepresentation is not only not in error, but lays the foundation for its conclusion that Evon is equitably estopped from asserting that any amount, other than that declared in the Final Inventory, is the amount agreed to be divided in the Memorandum, wherein Evon was also a signatory. That this amount is now known to include non-probate property is a function merely of Evon's misrepresentation. The District Court did not err in so concluding.

ISSUE 6

¶63 **Did the District Court erroneously consider parol evidence and erroneously admit Exhibit 11 into evidence?**

¶64 The determination of the adequacy of foundation for the admission of evidence is within the discretion of the trial court and will not be overturned absent a clear abuse of discretion. *State v. Christenson* (1991), 250 Mont. 351, 359, 820 P.2d 1303, 1308. Exhibit 11 is the aforementioned letter from Glenn E. Tremper asking Evon's counsel to confirm that

17

the settlement reached in this case "includes the assets identified by Evon as belonging to Ernestine in her proposed Final Accounting."

¶65 The District Court concluded it was proper to consider the circumstances under which the Memorandum was made, without consideration of any mediation-related communications, in construing the agreement. The court concluded that extrinsic evidence concerning the Memorandum was properly considered given there was a "mistake or imperfection" in the Memorandum that had been placed in issue, specifically that the term "remainder" was not defined or made clear in the Memorandum, creating an ambiguity in the Memorandum requiring extrinsic evidence to resolve.

¶66 Evon first argues Rule 408, M.R.Evid., prohibited admission of the exhibit. Rule 408 provides:

> **Compromise and offers to compromise.** Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

Evon argues that, as the third paragraph of Tremper's letter refers to his "understanding" of certain statements or conduct made at the settlement negotiations, and as such, is not admissible as it is "evidence of conduct or statements made in compromise negotiations."

¶67 In *Kaeding v. W.R. Grace & Co.,* 1998 MT 160, 289 Mont. 343, 961 P.2d 1256, this

18

Court made clear that, under the plain language of Rule 408, M.R.Evid., the rule "only excludes evidence that is being offered to prove liability or the validity of a claim or amount." *Kaeding*, ¶ 30. As noted in the Commission Comments to the rule, a party should not be able to keep otherwise discoverable evidence from being admissible simply by presenting it during compromise negotiations.

¶68 Moreover, under the plain language of the rule, it does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness. In the instant case, Tremper's letter, which was written after negotiations and the Memorandum were completed, was offered merely as evidence that the negotiating parties were indeed negotiating under the assumption that Evon's Final Inventory represented the amount of the estate to be divided.

¶69 Evon also contends, however, that Exhibit 11 was inadmissable under § 26-1-813(1) and (2)(a), MCA, which provide:

> **Mediation -- confidentiality -- privilege -- exceptions.** (1) Mediation means a private, confidential, informal dispute resolution process in which an impartial and neutral third person, the mediator, assists disputing parties to resolve their differences. In the mediation process, decision making authority remains with the parties and the mediator does not have authority to compel a resolution or to render a judgment on any issue. A mediator may encourage and assist the parties to reach their own mutually acceptable settlement by facilitating an exchange of information between the parties, helping to clarify issues and interests, ensuring that relevant information is brought forth, and assisting the parties to voluntarily resolve their dispute.
> (2) Except upon written agreement of the parties and the mediator, mediation proceedings must be:
> (a) confidential;

Evon argues that, since Tremper's letter "purports to further discuss the scope of the

settlement reached at the mediation, it should be confidential pursuant to the statute."

¶70    Charlene notes that the plain language of the statute makes confidential the "mediation process." Charlene notes that Tremper's letter was written one week subsequent to the mediation, and argues that it was thus not part of the process, and is likewise not part of the mediator's report nor part of his files or records. Charlene also notes that the letter was properly admitted extrinsic evidence to help the District Court rule on the ambiguity of what was meant by "the remainder" and the amount to be distributed.

¶71    We agree that, given the nature of the letter, being written post-mediation and, thus, not a part of the mediation process, § 26-1-813, MCA, is inapplicable.

¶72    Finally, Charlene charges the District Court violated Montana's parol evidence rule, first citing to § 28-2-904, MCA, which provides:

> **Effect of written contract on oral agreements.** The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the oral negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument.

Montana's parol evidence rule, codified under § 28-2-905, MCA, provides in part:

> **When extrinsic evidence concerning a written agreement may be considered.** (1) Whenever the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms. Therefore, there can be between the parties and their representatives or successors in interest no evidence of the terms of the agreement other than the contents of the writing except in the following cases:
>     (a)  when a mistake or imperfection of the writing is put in issue by the pleadings;
>     (b)  when the validity of the agreement is the fact in dispute.

Evon argues that there was no reason to look outside the terms of the agreement in order to apply them.

20

¶73    "The role of the judge is to construe an instrument according to its terms or its substance, not to insert or omit terms. Section 1-4-101, MCA. The judge, however, may consider circumstances surrounding the execution, including the situation of the subject of the instrument and of the parties, to place himself in a position to interpret the language." *Martin v. Laurel Cable TV* (1985), 215 Mont. 229, 233, 696 P.2d 454, 457 (citing § 1-4-102 and § 28-2-905(2), MCA).

¶74    "Before a party to a contract can successfully claim applicability of the parol evidence rule, there must be a showing that the instrument is a complete and final document intended by the parties to contain all the terms of the contract." *State v. Frederick* (1984), 208 Mont. 112, 115, 676 P.2d 213, 215 (citation omitted).

¶75    Given Evon's counsel admitted the term "remainder" is not defined in the agreement, the specific dispute in this matter involves whether the "remainder" included probate as well as non-probate property, and other aforementioned factors, we conclude that the term "remainder," as used in the Memorandum, was ambiguous, being capable of more than one meaning, that is, it may or may not have included non-probate property.

¶76    Evon notes that the Stipulation, filed November 28, 2001, to which the Memorandum is attached, states that the Memorandum is to be a compromise of all of the controversies concerning the assets and property of "said probate Estate." Evon asserts that the above language, read together with the language in the Memorandum, makes it clear the parties agreed to divide only probate property in the Memorandum. However, such a conclusion is contrary to the bulk of the evidence considered by the District Court when it concluded that

21

the negotiating parties relied specifically on Evon's Final Inventory in acceding as to how the estate should be divided, especially in light of the fact the Final Inventory made no distinction between probate and non-probate property. It seems to this Court unlikely, given the paramount disagreement as to the meaning of the term "remainder," that such ambiguity was knowingly resolved to the satisfaction of all parties by the innocuous language in the Stipulation.

¶77 We thus conclude that the District Court did not err in admitting and considering Exhibit 11 to aid it in determining the meaning of the term in the Memorandum. Accordingly, the District Court did not abuse its discretion

ISSUE 7

¶78 **Did the District Court err by awarding interest on Charlene's estate distribution?**

¶79 In its Findings of Fact and Conclusions of Law, the District Court awarded interest to Charlene from the time of the Memorandum until the time of the entry of the District Court's findings and conclusions. Citing the New York Surrogate Court case of *In re Estate of Paruch* (1994), 161 Misc.2d 526, 527-528, 614 N.Y.S.2d 673, 673-674, Evon argues that there is no legal basis for such award and that, as residuary beneficiary of the estate, Charlene is entitled to her share of the estate's earnings, less expenses during the period of probate, and nothing more.

¶80 Charlene responds noting that in the District Court, Evon's motion to alter or amend judgment merely contended that Charlene had not requested such interest and did not assert error on the basis of legality, such as she argues on appeal.

¶81 We have repeatedly held that we will not consider new legal theories on appeal because it is unfair to fault the trial court on an issue it was never given an opportunity to consider. *In re Marriage of O'Moore*, 2002 MT 31, ¶ 3, 308 Mont. 258, ¶ 3, 42 P.3d 767, ¶ 3 (citation omitted). As the District Court was not given an opportunity to address this legal theory, we will not address it on appeal.

ISSUE 8

¶82 **Did the District Court err by awarding beneficiaries' shares of the estate to Charlene?**

¶83 Evon argues that, in awarding Charlene an equal share of the American Express annuities and the Oppenheimer fund account, the District Court effectively reduced the percentage share to be received by the other Stukey descendants. However, as Charlene correctly notes, Evon's argument ignores the agreement in the Memorandum that, after certain specific distributions, the remaining balance of the available assets are to be divided equally between Charlene and the Leistiko heirs. We reiterate that the District Court merely enforced the Memorandum, as agreed to by all of the parties. Accordingly, we find no improper reduction in the amount to be received by the Leistiko heirs, and no error in the District Court enforcing the Memorandum as agreed.

ISSUE 9

¶84 **Are the District Court's Findings of Fact clearly erroneous?**

¶85 Evon challenges no less than twenty-eight of the District Court's Findings of Fact, many challenges being little more than restatements of earlier alleged errors. For instance, Evon challenges the District Court's Findings of Fact Nos. 40 and 58, finding an "ambiguity"

23

in the Memorandum by ignoring the "express language in the Stipulation," and adds that, in the alternative, if an ambiguity did indeed exist, the District Court erred by failing to construe the ambiguity against the drafter, in spite of the fact that the Memorandum was co-drafted by all parties involved in the negotiations.

¶86 In challenging Finding of Fact No. 13, where the District Court determined Evon's Final Inventory did not mention annuities or jointly held property, did not mention beneficiary interests, and made no indication that any values reported were no longer assets of the protected person, Evon argues that the District Court ignored witness testimony that such information was not required to be included in the Final Inventory. Evon's argument, however, is improper in that it does not so much as attempt to claim the District Court's finding is clearly erroneous.

¶87 Evon's further challenges to the District Court's findings are little more than an invitation for this Court to re-engage our foregoing analysis of previous issues. We decline to readdress matters already decided.

ISSUE 10

¶88 **Did the District Court improperly sign Charlene's proposed orders?**

¶89 Evon argues that the District Court erred by adopting much of the proposed findings prepared by Charlene and by entering its order denying Evon's motion to alter or amend judgment after receiving a brief in support and Charlene's response, but before Evon filed her reply brief. Evon acknowledges that Rule 52(a), M.R.Civ.P., specifically states that a court may adopt any proposed findings and conclusions so long as they are supported by the

24

evidence and law of the case, but argues that the District Court's Findings, Conclusions, Order, and denial of the motion to alter or amend are clearly erroneous.

¶90     Charlene correctly notes this Court has consistently held that a court's adoption of the findings and conclusions presented by the prevailing party is not grounds for reversal. *See In re Marriage of Nikolaisen* (1993), 257 Mont. 1, 5, 847 P.2d 287, 289.  Instead, we examine whether the findings are sufficiently comprehensive, pertinent and supported by substantial evidence to provide a basis for the decision. *Nikolaisen*, 257 Mont. at 5, 847 P.2d at 289 (citing *In re Marriage of Hurley* (1986), 222 Mont. 287, 296, 721 P.2d 1279, 1285).

¶91     We conclude that the District Court's findings are sufficiently comprehensive and supported by substantial evidence.  Mere adoption of Charlene's proposed findings and conclusions is not grounds for reversal.

¶92     Neither is the District Court's denial of Evon's motion to alter or amend prior to receiving Evon's reply grounds for reversal.  This Court does not condone or encourage entering orders prior to the expiration of the time for briefing.  Evon, however, offers no legal argument or analysis to support a conclusion that any due process rights were implicated by the denial of her motion, especially in light of the District Court's comprehensive findings and conclusions.  It is not the job of this Court to develop a party's arguments.  Rule 23(a)(4), M.R.App.P.

¶93     We decline to award Charlene sanctions.  Affirmed.


                                        /S/ JIM REGNIER

We Concur:

/S/ KARLA M. GRAY
/S/ PATRICIA O. COTTER
/S/ JOHN WARNER
/S/ W. WILLIAM LEAPHART